No. 2--02--1233

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

HANCHETT PAPER COMPANY, d/b/a     ) Appeal from the Circuit Court

Shorr Packing Corporation, a/k/a  ) of Kane County.

Shorr Paper Products, Inc.,       )

                                  )

Plaintiff-Appellee,          )

                                  )      

v.                                ) No. 02--CH--876         

                                  ) 

FRANK MELCHIORRE,                 ) Honorable                  

                                  ) Patrick J. Dixon,

Defendant-Appellant.         ) Judge, Presiding.

_________________________________________________________________

JUSTICE McLAREN delivered the opinion of the court:
 
Defendant, Frank Melchiorre, appeals an order granting a preliminary injunction enjoining defendant from soliciting, selling to, or servicing customers defendant serviced while he was employed by plaintiff
,
 Hanchett Paper Company, d/b/a Shorr Packaging Corporation, a/k/a Shorr Paper Products, Inc.  Defendant was employed by plaintiff as a sales representative from July 1990 until July 2002.  Defendant then began to work for Stamar Packaging, a competitor of plaintiff's
.
  We affirm.

Plaintiff, an Illinois corporation, is a distributor of packaging products such as corrugated boxes, shrink wrap, tape, adhesive, protective packaging materials, and related items.  
Plaintiff stocks the products, provides customer service, insurance, telephone, and other support and employs warehouse personnel to take orders, freight lines, delivery trucks, office staff, product managers, and a management team to accompany sales representatives on sales calls.
  Plaintiff spends millions of dollars each year trying to develop and maintain its customers.  It can take nine months to several years to develop a customer.  Defendant stated that developing a customer is a "team effort."  

David Shorr, plaintiff's president and chief operating officer, testified that a list of prospective customers is given to a sales representative.  This list is prepared by plaintiff by narrowing down a larger list of potential customers.  This process takes a lot of work.  Although plaintiff's website contains base prices and uses professional directories and telephone books, its potential customer list is not readily obtainable from these sources.  These sources do not disclose which businesses are plaintiff’s customers, who should be contacted at those businesses, how much the businesses have bought in the past, which products they have purchased, or when they make those purchases. Shorr stated that the information was confidential "[b]ecause we've gone through the trouble and the work of developing those [potential customers] into more than just a name" and the information is not readily available to competitors.  Shorr explained that plaintiff provided the following to help defendant: customer lists; invoices; customer usage reports indicating what, when, and how much a customer bought; and profit margin information, including prices and plaintiff’s costs.  The customer usage reports indicated what products the customers purchased, when they purchased it, and how much they purchased.

Leo Albert Dieter, plaintiff's chief financial officer, testified that plaintiff has a long-term relationship with its customers and encourages its sales representative to develop relationships with customers because that is the best way of maintaining customers.  Of the top 300 customers in sales volume in fiscal year 2001, two-thirds of them had been plaintiff’s customers for at least five years.  These top 300 customers accounted for 80% of plaintiff’s sales in 2001-02.  Dieter stated that plaintiff's customer and vendor lists are protected by the use of a computer- based password-accessible system.  

Shorr testified that about half of defendant's customers were transferred to defendant by plaintiff.  At the time of defendant's departure, two-thirds of his top 50 customers had been plaintiff’s customers for at least five years.  These top 50 customers accounted for 90% of defendant’s sales.  Almost all of defendant’s customers were within 50 miles of plaintiff’s location in Aurora. 

John Tedesco, president of Stamar Packaging, and defendant both testified that plaintiff’s business, that is, the packaging business, is highly competitive and that the products are sold by many different companies, all using the same vendors and manufacturers, selling the same products.  The products sold by plaintiff are fungible.  Most sales are accomplished through cold calls.  Almost all of plaintiff's customers also bought packaging products from more than one distributor simultaneously.  Thus, none of defendant’s customers’s bought exclusively from plaintiff.  They all purchased from other distributors while purchasing from plaintiff.   Vendors and manufacturers possess information about plaintiff’s business, such as customer identities and contacts, products purchased, frequency of purchases, and pricing.  Defendant competed by learning competitors' prices and trying to beat the price.  The customers often provided this information to defendant to get a better price.  Plaintiff published its price ranges, manufacturers, and available products on its public website.  Plaintiff encouraged its representatives to develop customers by using the telephone book, Illinois Manufacturers Guide, D & B Rating Book, Standard Industrial Codes, trade journals, and newspapers.  

Defendant was first employed by plaintiff in July 1990 as a sales representative.  Before defendant’s employment with plaintiff, he had no prior experience as a sales representative in the packaging industry.  However, defendant testified that he had experience as a sales representative for three years with three different companies.  Defendant testified that when he was hired by plaintiff defendant received two weeks of "intense" product training, which consisted of outside vendors coming in to describe their products and explain how to sell the products.  Defendant received no other formal training.  Defendant was responsible for generating sales for plaintiff.  Defendant testified that about 33 of defendant’s 102 customers were transferred to defendant by plaintiff.  Defendant developed the remaining customers.  Defendant developed customers through cold calls and referrals and by visiting companies and speaking to their employees.  Defendant earned $100,000 to $125,000 a year while working for plaintiff and paid his own business expenses, such as client entertainment and gifts, travel, cell phone, and his home office.  

Defendant stated that in April 2000, before defendant left plaintiff, defendant began to direct customer orders to be filled by Stamar, through Tedesco, defendant's future boss.  Over $11,000 in orders were filled this way before defendant left plaintiff’s employ.  Defendant voluntarily left plaintiff’s employ on July 3, 2002, and was hired by Stamar on August 7, 2002.  While at Stamar, all but one of defendant’s customers were developed by defendant while he worked for plaintiff.  By September 23, 2002, defendant generated over $213,000 in sales from these customers.  The products sold and prices charged to customers for sales made through Stamar were roughly the same as the products sold and prices charged them while defendant was employed by plaintiff.  Defendant used the deviated pricing information he learned from plaintiff to get the same prices for the same customers while defendant worked for Stamar.

Tedesco testified that Stamar is a competitor of plaintiff’s.  Defendant sold the same products and performed the same sales function for Stamar as he performed for plaintiff.  The prices listed on plaintiff’s websites are not actual prices but merely a starting point for a sale.  Tedesco opined that pricing information such as profit margins is valuable and confidential information.  Defendant received no commission from Stamar for the sales he referred to Stamar before he began to work for Stamar. 

At the beginning of defendant’s employment with plaintiff, defendant entered into a written employment contract with plaintiff.  The written contract provided, in pertinent part, that

defendant agreed that: while he worked for plaintiff he would work for no other company; following defendant’s termination for any reason, he would not solicit, service, sell or cater to any business similar to plaintiff’s or engage in, assist, be interested in or connected with any other entity that solicited from, served, sold or catered to any customer or solicited customer within 
50 miles
 of plaintiff’s place of business for 
one year
; customers serviced by defendant would be determined at the time of defendant’s termination; customers, customer names, price lists, sales invoices, names of customers' personnel in defendant’s trade area were plaintiff’s customers, had great value, and were confidential; defendant would return such information at the time of his termination; customer information defendant learned while employed by plaintiff was confidential and would not be disclosed by defendant either during employment or after termination; if defendant breached the agreement, monetary damages would be inadequate and plaintiff could seek equitable relief, and; the terms in paragraph seven survive the termination of the agreement.

Robert Taylor, a branch manager for plaintiff, testified that during an exit interview defendant stated that he did not intend to compete with plaintiff and indicated that he might go into his friends' restaurant business.  Taylor also asked defendant to return all "customer files," but defendant replied that he had none.  Actually, defendant had retained his customer list, which showed sales, costs, profit, and margin pricing, and his customer usage reports, which he later returned to plaintiff through his attorney.  Shorr testified that such information is confidential.  Tedesco testified that margin pricing information is confidential.  Larry Stein, a sales representative with a competitor of plaintiff's, testified that customer usage reports are confidential.  

Defendant testified that he left plaintiff’s employ after plaintiff changed his compensation from 100% commission to salary plus a small percentage of commission.  Defendant stated that he met with plaintiff’s plant manager, Robert Taylor, after he resigned and that he gave Taylor a box of material relating to plaintiff’s business.  Months later, defendant returned additional material he had discovered in his possession.  Defendant stated that he did not use these forgotten materials in his new position at Stamar. 

Plaintiff learned of defendant’s activities after defendant left plaintiff’s employ.  After first sending defendant a cease and desist letter, plaintiff filed a complaint against defendant seeking injunctive relief.  On August 21, 2002, plaintiff requested a preliminary injunction.  Plaintiff requested that defendant be enjoined for one year from soliciting, selling to, or servicing those customers or prospective customers of plaintiff’s that defendant had solicited, sold to, or serviced while employed with plaintiff. 

After an evidentiary hearing, the trial court granted a preliminary injunction, enjoining defendant from "soliciting, selling to, or servicing directly or indirectly, those customers set forth on plaintiff’s exhibit No. 4 *** (that is customers serviced by defendant while employed at Shorr Packaging Corporation)."  Defendant filed this timely appeal and deposited a bond. 

On appeal, defendant argues that the trial court erred by granting a preliminary injunction because plaintiff did not sufficiently establish a protectable business interest.  We disagree with defendant.

A preliminary injunction is a provisional remedy granted to preserve the status quo pending a hearing on the merits of a case.  A court may not grant a preliminary injunction without a showing that: (1) the party seeking the preliminary injunction possesses a clear right or interest needing protection; (2) the party has no adequate remedy at law; (3) irreparable harm will result if the preliminary injunction is not granted; and (4) there is reasonable likelihood of success on the merits.  
Office Mates 5, North Shore, Inc. v. Hazen
, 234 Ill. App. 3d 557, 567 (1992).  On review, we will not disturb a trial court's decision to grant a preliminary injunction, absent an abuse of discretion.  
Office Mates 5
, 234 Ill. App. 3d at 567.

 The propriety of injunctive relief based on a covenant not to compete depends on the enforceability of that covenant.  
Office Mates 5
, 234 Ill. App. 3d at 568.  The determination of the enforceability of a restrictive covenant is a question of law. 
Office Mates 5
, 234 Ill. App. 3d at 568.  

Because such covenants are a restraint on trade, courts must strictly construe them to ensure that their intended effect is not to prevent competition 
per se
.  
Office Mates 5
, 234 Ill. App. 3d at 568.  In Illinois, courts will not enforce a covenant not to compete unless the terms of the agreement are reasonable and necessary to protect an employer's legitimate business interests.  
Office Mates 5
, 234 Ill. App. 3d at 568.  A legitimate business interest exists where: (1) because of the nature of the business, the customers' relationships with the employer are near permanent and the employee would not have had contact with the customers absent the employee's employment; and (2) the employee gained confidential information through his employment that he attempted to use for his own benefit.  
Office Mates 5
, 234 Ill. App. 3d at 569.

Defendant argues that plaintiff’s relationships with its customers were not near permanent because its customers bought the same products from other companies while they were plaintiff's customers.  Plaintiff argues that exclusivity is not necessary to establish a near-permanent relationship. 

Illinois courts have applied two tests to determine whether an employer has a near-permanent relationship with its customers: the nature-of-the-business test, which considers the general characteristics of a business; and the seven-factors test, established in 
Agrimerica, Inc. v. Mathes
, 199 Ill. App. 3d 435 (1990).  We believe that the seven-factors test is more appropriate to this case because it provides a more complete analysis of the facts at issue here. 

We recognize that it is difficult to show a near-permanent relationship with customers of businesses that are engaged in sales, do not provide a unique product, have customers that engage in cross-purchasing, and have customers whose identities are well known throughout the industry.  
Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.
, 292 Ill. App. 3d 131, 142 (1997).  However, to satisfy the near-permanency test a business need not show that its customer relationships are perpetual or indissoluble, that it has an exclusive relationship with its customers, or that a near-permanent relationship existed with each customer.  
Audio Properties, Inc. v. Kovach
, 275 Ill. App. 3d 145, 149 (1995). 

To determine whether an employer has a near-permanent relationship with its customers, Illinois courts consider the following factors: 

"(1) the length of time required to develop the clientele;  (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customer's association with the employer;  and (7) the continuity of the employer-customer relationships."  
Audio Properties
, 275 Ill. App. 3d at 148-49. 

The first, second, and third factors favor plaintiff.  The record indicates that plaintiff must cultivate a potential client for a substantial period and that it takes months to years to develop a customer relationship.  Further, the record reveals that plaintiff invested millions of dollars each year using the efforts of a team to acquire customers and cultivate extensive customer buying information over a long period of time in anticipation of developing business.  Plaintiff protected this information through a computer system accessible by password. 

The fourth factor, the extent of personal customer contact by the employee, favors neither plaintiff nor defendant.  Here, the record indicates that defendant enjoyed close personal contact with customers and possessed detailed knowledge of their respective needs.  However, like the customers in 
Tyler Enterprises of Elwood, Inc. v. Shafer
, 214 Ill. App. 3d 145, 150 (1991),
 
Agrimerica
, 199 Ill. App. 3d at 445-46, and
 
McRand, Inc. v. Van Beelen
, 138 Ill. App. 3d 1045, 1053 (1985), customers came to plaintiff in this case for a product offered by plaintiff through defendant.  Although the customers in the cases cited were not exclusive, the courts held that near-permanent relationships existed.  See
 
Tyler
, 214 Ill. App. 3d at 150 (customers bought the employer's lawn care products); 
Agrimerica,
 199 Ill. App. 3d at 445-46 (customers bought the employer's animal feed products); 
McRand
, 138 Ill. App. 3d at 1053 (customers bought business awards).  These cases are substantially similar to this case in that the former employees were little more than sellers of the employers' products and services.  Thus, although defendant had personal contact with customers, we cannot say that this factor favors defendant. 

The fifth factor, the extent of the employer's knowledge of its clients, favors plaintiff.  The record indicates that plaintiff took great care to acquire and retain information related to its customers' specific needs and requirements.

Finally, we believe that plaintiff has met its burden with regard to the sixth and seventh factors, duration of the customer's association with the employer and the continuity of the employer- customer relationship.  Two-thirds of plaintiff's top 300 customers had been customers for at least five years.  Plaintiff transferred customers to defendant when defendant began working for plaintiff,  and 90% of defendant's top customers had been plaintiff's customers for at least five years.  Thus, we believe that these factors support the trial court's decision.

We also must discuss whether defendant would have had contact with plaintiff's customers absent his association with plaintiff.  Defendant contends that, because he could have contacted the customers notwithstanding his employment with plaintiff and the business is competitive and involves fungible goods, plaintiff did not establish a near-permanent relationship.  We note that defendant came to plaintiff with no knowledge of the packaging industry.  Defendant gained his knowledge of the industry through plaintiff.  Plaintiff gave defendant access to a customer list that it had developed at great cost and transferred existing customers to defendant. Further, we do not agree with defendant's assertion that he could have sold to plaintiff's customers absent his employment with plaintiff.  The record indicates that two-thirds of defendant’s top 50 customers had been plaintiff’s customers for at least five years.  These top 50 customers accounted for 90% of defendant’s sales.  Consequently, while we may have ruled differently on these facts, we cannot say that the trial court abused its discretion by granting plaintiff's motion for a preliminary injunction.  See 
Lyle R. Jager Agency, Inc. v. Steward,
 253 Ill. App. 3d 631, 639 (1993).  Here, the court granted a preliminary injunction and our review is limited to whether plaintiff presented a 
prima facie
 case that there is a fair question concerning the existence of the claimed rights.  See 
People ex rel. Klaeren v. Village of Lisle
, 202 Ill. 2d 164, 177 (2002).  In light of the record before us, and the standard of proof before the trial court and the standard of review, we decline to disturb the trial court's order.

Defendant cites the following cases to support his argument that plaintiff had not established a near-permanent relationship with its customers:  
Lawrence & Allen, Inc. v. Cambridge Human Resource Group
, 292 Ill. App. 3d 131 (1997); 
Springfield Rare Coin Galleries, Inc. v. Mileham
, 250 Ill. App. 3d 922 (1993); 
Office Mates 5, North Shore, Inc. v. Hazen
, 234 Ill. App. 3d 557 (1992); 
Label Printers v. Pflug
, 206 Ill. App. 3d 483 (1991); 
Reinhardt Printing Co. v. Feld
, 142 Ill. App. 3d 9 (1986); and 
Iroquois Industries Corp. v. Popik
, 91 Ill. App. 3d 505 (1980).  However, these cases are factually distinguishable from the case at bar.  Unlike plaintiff in this case, the plaintiffs in the cases cited 

by defendant did not establish that they incurred great expense to develop customer lists, that they needed to protect confidential information, such as margin pricing information, or that their relationships with most of their customers had existed for five years or longer. 
Lawrence & Allen
, 292 Ill. App. 3d at 143; 
Springfield Rare Coin
, 250 Ill. App. 3d at 931; 
Office Mates 5
, 234 Ill. App. 3d at 572; 
Label Printers
, 206 Ill. App. 3d at 491, 493; 
Reinhardt Printing
, 142 Ill. App. 3d at 17; 
Iroquois
, 91 Ill. App. 3d at 509.  Accordingly, these cases are not controlling here.

We granted defendant's motion to cite to additional authority but note that the case cited is distinguishable from the case at bar.  See 
Unisource Worldwide, Inc. v. Carrara
, No. 3--1015, February 19, 2003 (C.D. Ill.).  In 
Unisource
, the plaintiff/employer did not argue that it had a near-permanent relationship with its customers.  Therefore, the case is not controlling here.

Next, defendant argues that the trial court erred by issuing the preliminary injunction to rewrite an overly broad restrictive covenant.  Here, the relevant provisions of the restrictive covenant provide:

"a) For a period of one (1) year after the termination of this Agreement, irrespective of the time, manner or cause of termination, employee covenants and agrees that he will not, directly or indirectly, either as principle, agent, employee, employer, stockholder, co-partner, or any other individual or representative capacity whatsoever:

(1) solicit, serve, sell or cater to, in a business similar to or competitive with employer,

(2) engage in, assist, be interested in or [in] connection with any other person, firm, corporation, or other entity soliciting from, serving, selling to, or catering to any customer or employer or any person, firm, corporation or other entity, that employer has sought to become its customer, within the area encompassed by a radius of fifty (50) miles from the employer's place of business at 227 S. River Street, Aurora, Kane County, Illinois 60507 and within fifty (50) miles of any other site of business from which employee is assigned to work.  The determination of who are the employer's customers and the persons, firms, corporation, and other entities that employer has sought to become its customers, shall be made as of the date of the termination of this Agreement."

The trial court's order provides:

"Frank Melchiorre is preliminarily enjoined from soliciting, selling to, or servicing directly or indirectly, those customers set forth on plaintiff's exhibit no. 4 in evidence, during the pendency of this cause (that is, the customers serviced by defendant while employed at Shorr Packaging Corporation)."

In this case, plaintiff sought enforcement of only part of the covenant, that is, the prohibition against soliciting clients defendant serviced while working for plaintiff.  By preliminarily granting this request, the trial court did not rewrite the contract but did what was within its powers to do.  Although, after a full hearing, the court may inevitably find that the restrictive covenant is unenforceable, we do not believe it abused its discretion in maintaining the status quo at this point in the litigation.

Lee/O'Keefe Insurance Agency, Inc. v. Ferega
, 163 Ill. App. 3d 997 (1987), cited by defendant, is distinguishable from the case at bar.  In 
Lee/O'Keefe
 the court affirmed the trial court's denial of a preliminary injunction because the restrictive covenant at issue contained no temporal or geographical limitations and the plaintiff had a short-term relationship with its customers.  
Lee/O'Keefe
, 163 Ill. App. 3d at 1004-05.  In contrast, the restrictive covenant at issue here contains limitations of 50 miles and one year.  Further, plaintiff had relationships with most of its customers for at least five years.  Thus, we do not believe 
Lee/O'Keefe
 is controlling here.

Defendant urges this court to limit the injunction to the accounts that plaintiff transferred to defendant.  Defendant notes that the trial court initially decided to limit the injunction to these transferred accounts but then broadened the injunction out of frustration.  Our duty here is to determine whether the trial court's order amounts to an abuse of discretion.  The fact that the trial court entertained a narrower injunction before entering the order at issue here does not warrant modification, as we have determined that the trial court did not abuse its discretion.

Finally, we disagree with defendant's characterization of the trial court's order as permitting the injunction to continue for an indeterminate period of time.  The order expressly states that the injunction will be in force for no longer than through July 3, 2003, which is one year after defendant's termination, in accord with the covenant.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

BOWMAN and GILLERAN JOHNSON, JJ., concur.