No. 2--05--0806

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE AGENCY, INC., d/b/a The Agency ) Appeal from the Circuit Court

Staffing, ) of McHenry County.

)

Plaintiff-Appellant, )

)

v. ) No. 05--CH--289

)

JANET GROVE and ACCURATE )

AJM, INC., ) Honorable

) Michael T. Caldwell,

Defendants-Appellees. ) Judge, Presiding.

______________________________________________________________________________

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff, The Agency, Inc., filed a complaint against Janet Grove, its former employee, and Accurate AJM, Inc., her current employer, alleging violations of the Illinois Trade Secrets Act (Trade Secrets Act) (765 ILCS 1065/1 
et seq.
 (West 2002)) and of a "Covenant Not to Compete" (Covenant) that Grove signed while employed with plaintiff.  Plaintiff alleged that Grove appropriated confidential information while in plaintiff's employ.  Plaintiff sought preliminary and permanent injunctions to enforce a confidentiality provision in the Covenant.  Plaintiff also sought injunctive relief to enforce the Covenant's provision prohibiting Grove from competing with plaintiff within 35 miles of its offices for 14 months after the termination of her employment.  Finally, plaintiff sought compensatory damages.  The trial court determined that the Covenant was unenforceable and denied the request for preliminary injunctive relief.  Plaintiff appeals, asking us to reverse the trial court and enter preliminary injunctions enforcing the noncompetition and confidentiality provisions of the Covenant.  We find the issue of the enforceability of the 14-month prohibition moot and reverse the judgment of the trial court on the confidentiality provision.

We first explain our finding of mootness.  Grove’s employment with plaintiff began on June 20, 2000.  The Covenant she signed provided in relevant part:

"1. I acknowledge that [plaintiff] has developed certain business information and methods of operation including but not limited to client lists, client's temporary and permanent employment needs, client's hiring qualifications and other preferences, fees charged to clients for services, business methods utilized in the acquisition and servicing of clients, business methods utilized in developing and maintaining sources and supply of skilled and unskilled labor, costs and markups, and other information legally described as 'trade secrets.'

2. I acknowledge that I will have access to [plaintiff's] records that include the foregoing business information as well as develop additional such information as part of my job duties.  I understand that [plaintiff] has developed the foregoing business information and methods at its expense and utilizes the information to maintain a competitive position within the industry, and said information has also been determined to be 'trade secrets.'

3. I acknowledge and understand that the foregoing 'trade secrets' and methods are treated by [plaintiff] as confidential and must be protected from disclosure so as to not damage [plaintiff's] competitive position in the industry.

4. I, therefore, agree that I will not, at any time, either while employed by [plaintiff] or afterwards, make any independent use of or disclose to any person, firm or corporation any 'trade secret' or methods described above developed by [plaintiff].

5. I agree that if my employment with [plaintiff] is terminated for whatever reason I will not, for a period of fourteen (14) months following the termination of employment, directly or indirectly, work for or engage in any business competitive with [plaintiff], within a thirty-five (35) mile radius of any office of [plaintiff].  I also agree that for a period of fourteen (14) months following the termination of employment, I will not call on or solicit any of the clients of [plaintiff] to whom I have rendered services, had contact with, or knowledge of by any reason of my employment with [plaintiff]." 

Grove's final day of employment with plaintiff was August 13, 2004.  Ten months later, on June 14, 2005, plaintiff filed its complaint.  A hearing on plaintiff's petition for injunctions began on June 23 and concluded on June 29.  The trial court issued its ruling on August 3, and plaintiff filed its notice of appeal on August 16.  Briefing was completed on September 26.  The 14-month prohibition expired on October 13.  (Notably, 10 months alone elapsed between Grove's final day of employment and the initiation of the lawsuit.)  Thus, the issue of the enforceability of that provision is moot.  See 
La Salle National Bank, N.A. v. City of Lake Forest
, 297 Ill. App. 3d 36, 43 (1998) ("An issue is moot when its resolution could not have any practical effect on the existing controversy").

What remains is the issue of whether Grove should be preliminarily enjoined from disclosing or using information that plaintiff claims is confidential.  The hearing disclosed the following evidence relative to this issue.  Plaintiff is in the business of placing temporary workers in various businesses and has branches in McHenry, West Dundee, Hampshire, and Rochelle.  Plaintiff earns its profit by markup, which is the difference between the rates it charges a client for a worker and the rate it pays the worker.  Plaintiff employs sales representatives to generate new clients.  Grove served as a sales representative in plaintiff's McHenry office.  Upon leaving plaintiff's employ, Grove told plaintiff that she was "retiring" from sales and wanted to spend time with her husband.  Instead, Grove began working for Accurate, a competitor of plaintiff's in the temporary staffing business.  In her testimony at the hearing, Grove testified that her remark about retiring was just a joke.

Yvonne Graff, plaintiff's operations manager, testified that plaintiff maintains a computer network that is accessible only by password.  Plaintiff limits Internet and e-mail availability to branch managers in order to limit the potential for disclosure of confidential information contained on the network.  Graff explained that one of the programs on the network is the "Task Generator," which Graff explained contains profiles of plaintiff's clients.  Graff testified that sales representatives are able to view the client profiles in the Task Generator but are unable to generate printouts, this privilege being reserved to branch managers.  Graff testified that the profiles in the Task Generator include a vast array of information on each of plaintiff's clients such as the client's business cycles (which affect its need for temporary workers), contract expiration dates, the client's credit information, the client's personnel preferences, worker placement history, the markups used for the client and the explanations therefor (
e.g.
, intensity of work, risk involved), and the client's contact persons along with their particular likes, dislikes, and even idiosyncracies.  Plaintiff introduced into evidence a printout of a section of the Task Generator containing profiles of seven different clients.  Each profile opens with a general description of the client followed by dated entries updating the profile.  The following two profiles (redacted by the parties in the trial court for confidentiality) are representative of the seven:

"[1]  Customer Profile [   ]

Primarily seasonal temporary outdoor general labor but good employees will be treated as 

Try-Hire.  Temps must have good English language skills--NO TRANSLATORS!

[   ] is the parks and facilities manager--most of our job orders will come from him.

[   ] is down to business, no messing around, wants employees that are ON TIME ALL THE TIME!  Hates tardiness and 'slackers.'

[   ] is the township supervisor--will handle any admin/office positions.

[   ] loves to talk about the charitable [   ] programs--Be careful, she'll hit you up for a donation almost every time you go to see her.

[   ] loves getting gifts!  Keeps several pictures of her kids and family on her desk so be sure to comment on them when you visit her.

[   ] likes regular phone calls.  Be sure to use his cell phone during his business hours as he's only in the shop very early and very late in the day.

8/19/03  9:54  [   ] REFERRED US TO THE [   ]

[   ] CALLED AND WANTS TO USE OUR SERVICE.  I SENT HIM A PROPOSAL YESTERDAY AND [   ] HAS IT AND WILL SHOW IT TO [   ] FOR APPROVAL.  I SENT [   ] A THANK YOU CARD AND TOLD HIM WE WOULD HAVE TO HAVE LUNCH ONE DAY SOON.  JLG.

[2]

Customer Profile [   ]

[   ] asked to call on this company.  [   ] said she used to do [   ] nails.

Seasonal temporary ONLY.  No English language skills req.

They make really cool soup mixes.

They buy foil stickers from [   ] (another one of our clients and where [   ] used to work.

[   ] talked with [   ] they used to laugh and giggle on the phone all the time--[   ] sat next to [   ])  Be sure and comment on how nice their packaging is and on the fancy foil stickers.

Marketing campaign '01; we bought cases of their soup mixes to use in marketing campaign this year--It was a great way to strengthen our relationship with this client!

Extremely casual environment, best not to over dress if you're going for a visit.

ALWAYS bring treats of some sort when you visit (not soup).

9/14/00  12:09 sent two girls over this morning.  Haven't heard from [   ] but no news is good news.  jlg

3/20/01 09:30 spoke with [   ] and she will pay her bill asap and she indicated that they would need people in July.  jlg

8/18/03 09:36 had lunch with [   ] on Friday and she says they just got a huge account [   ].  They will be leasing new space for just their [   ].  She said we could probably help them with staffing this new facility.  Plus their business is picking up and they will be calling us soon for assemblers.  jlg."

Graff testified that plaintiff maintains the confidentiality of the client profiles because they "help us to generate relationships, maintain relationships, build relationships with clients and prospects."  Graff noted that the client profiles "could easily be very valuable to another business."  Graff acknowledged that contact information such as the name of a company's personnel manager "sometimes" could be acquired by a simple phone call, but personal information about that individual or others in the company could not.  Graff further acknowledged that plaintiff sends out proposals on prospective jobs containing such information as the type of position to be filled and the rate of pay, and although these proposals are termed "confidential," the client does not sign any confidentiality agreement.  Graff testified that 80% of plaintiff's clients have been with plaintiff more than five years and, of these, at least seven have been with plaintiff more than 15 years.

Graff also testified that knowing a client's business cycles allows plaintiff to predict when the client will need employees.

Peter Gault, plaintiff's hiring and training director, testified that, in addition to the Task Generator, plaintiff maintains hard copies of client files that contain information similar to what the Task Generator contains.  Gault testified that the files are kept in a file cabinet in Gault's office.  Although the cabinet is unlocked during the day, it may not be accessed without Gault's permission.  Gault further testified that most of the information in the Task Generator's client profiles could not be learned from publicly available business directories.

Gault explained that plaintiff endeavors to gain personal knowledge about clients in order to establish lasting relationships.  Gault noted that plaintiff records information about "anything with regard to the environment of the company.  Anything with regard to personal preferences, personal information about a client, likes, what they might have on their desk that you might talk about."  For instance, plaintiff has recorded the fact that one of its client's contact people enjoys chocolate-covered strawberries.  Gault testified that plaintiff gives gifts to the contact people.  Gault stressed that "little things like that *** help you really understand the needs and wants of a client."

Gault testified in detail about the process of obtaining business from a prospective client.  Gault explained that the goal of a sales representative is to "make contact with the key contact on the third or fourth visit."  Gault explained that the preliminary visits are "designed *** so that the gate keepers, as they were, receptionists, secretaries are very comfortable seeing you come in time after time.  And also, you know, look forward to having you come in if you're bringing treats, items."  The success of these visits is no guarantee of business, Gault stressed, and often earns the sales representative only an appointment with a contact person.  At that appointment, Gault explained, the sales representative would try to "understand what kind of business they have; understand what type of employees they use, and when they use them, how they use them."  Gault explained that the process of getting an appointment alone takes at least a month.  Graff testified that it takes between 6 and 24 months to obtain a prospective client's business, the average being about 8 months.

Peggy Thodos, plaintiff's president, explained that plaintiff is unique among temporary staffing agencies in its efforts to build relationships with clients and know them personally.  Thodos testified that plaintiff organizes social gatherings and parties for its current clients as well for prospective clients.  Thodos related an occasion where she and other employees cooked hamburgers for all three shifts of a client's workforce at 150 employees per shift.  Thodos testified that, the closer the relationship plaintiff has to its client's key contact people, the easier it is to work with that client and the greater the chance that the client will strongly recommend plaintiff to a prospective client.  Thodos explained that plaintiff's philosophy is "to have our clients do our marketing for us."  Thodos testified: "We can sell ourselves until we are blue in the face, but our current clients that love and adore us can certainly be a much stronger referral to those perspective [
sic
] clients."

Thodos testified that business directories contain only company addresses, phone numbers, numbers of employees, and top personnel.  Thodos emphasized that this information alone is not sufficient for a staffing agency to acquire or maintain business.

Grove and Robert Migliore, president of Accurate, disagreed with plaintiff's witnesses about what was required to obtain information like that contained in plaintiff's client profiles.  They acknowledged that business directories do not contain such information but claimed that it could be obtained after one appointment with a client or even after one phone call.  Migliore also testified that a temporary staffing agency can learn a significant amount of information about a prospective client from temporary workers who had previously worked for that client.  Migliore acknowledged that knowing the business cycles of a prospective client would put a staffing agency at an advantage in procuring the client's business.

Plaintiff introduced into evidence a document called a "Client Catalog List" (Client List).  The Client List was produced by Grove during discovery.  The Client List contains brief profiles on 17 of plaintiff's clients.  The Client List contains much of the same information as the Task Generator printout.  Grove testified that she created the Client List in 2003 at Peter Gault's directive.  (Gault denied this.)  Grove testified that Gault told her to record "any thoughts that [she] might have on clients, pertinent information that they needed to know about."  Grove testified that she prepared the Client List largely from memories of her interaction with plaintiff's clients.  She admitted that the information she recorded in the Client List is precisely the type that plaintiff required its sales representatives to include in the client profiles of the Task Generator.  She further admitted that the  information in the Task Generator is "confidential" information.  Grove testified that, without plaintiff's knowledge, she retained the Client List after leaving plaintiff's employ and still possesses a copy.  Grove admitted that she has solicited business from companies that were clients of plaintiff's while Grove was employed there.  Grove denied, however, that she shared any of the information on the Client List with anyone at Accurate.  Asked if she told anyone at Accurate "the particular requirements" of the businesses that were plaintiff's clients when she was employed with plaintiff, she testified that she did not share such information about any particular client of plaintiff's until after that client became an "established client" of Accurate.

The trial court declined to hold that the client profiles in plaintiff's Task Generator were protectable confidential information.  The court reasoned:

"The identity of the employers needing temporary help is not a trade secret and is readily available.  Although [plaintiff] downplays the importance of the Manufacturer's Guide as a resource to identify potential clients, the fact that such a resource exists indicates that anyone with the time and willingness to do so could contact any or all of the manufacturers in McHenry County and solicit their business."

A party seeking a preliminary injunction must show that: (1) the party has a clear right or interest needing protection; (2) the party has no adequate remedy at law; (3) irreparable harm will result if the preliminary injunction is not issued; and (4) there is a reasonable likelihood of success on the merits.  
Hanchett Paper Co. v. Melchiorre
, 341 Ill. App. 3d 345, 351 (2003).  The party need establish only a 
prima facie
 case that there is a fair question as to the existence of the right claimed and the need for protection.  
Buzz Barton & Associates, Inc. v. Giannone
, 108 Ill. 2d 373, 382 (1985).  The trial court's disposition of a petition for a preliminary injunction will not be disturbed absent an abuse of discretion.  
Hanchett Paper Co.
, 341 Ill. App. 3d at 351.

The propriety of injunctive relief based on a covenant not to compete depends on the enforceability of that covenant.  
Hanchett Paper Co.
, 351 Ill. App. 3d at 351.  Covenants not to compete are a restraint on trade and, as such, are strictly construed by courts to ensure that their intended effect is not to prevent competition 
per se
.  
Hanchett Paper Co.
, 341 Ill. App. 3d at 351.   Courts will not enforce a covenant not to complete unless the terms of the agreement are reasonable and necessary to protect an employer's legitimate business interests.  
Hanchett Paper Co.
, 341 Ill. App. 3d at 351.  A legitimate business interest exists where: (1) because of the nature of the business, the customers' relationships with the employer are near-permanent and the employee would not have had contact with the customers absent the employee's employment; or (2) the employee gained confidential information through his employment that he attempted to use for his own benefit.  
Appelbaum v. Appelbaum
, 355 Ill. App. 3d 926, 934 (2005).  These questions necessarily involve matters of fact.  
A.J. Dralle, Inc. v. Air Technologies, Inc.
, 255 Ill. App. 3d 982, 991 (1994).

There is some mystery surrounding the standard of review that the courts of this state apply to a determination of the enforceability of a restrictive covenant.  Appellate court cases addressing such covenants often say their enforceability is a question of law that depends on the particular facts of each case.  See, 
e.g.
, 
L S B Z, Inc. v. Brokis
, 237 Ill. App. 3d 415, 425 (1992); 
Arpac Corp. v. Murray
, 226 Ill. App. 3d 65, 75 (1992); 
The Instrumentalist Co. v. Band, Inc.
, 134 Ill. App. 3d 884, 894-95 (1985); 
MBL (USA) Corp. v. Diekman
, 112 Ill. App. 3d 229, 237 (1983).  These cases are peculiarly silent as to how these issues of law and fact are to be reviewed.  Our research discloses only one case that actually states a standard of review.  In 
Hamer Holding Group, Inc. v. Elmore
, 244 Ill. App. 3d 1069, 1080 (1993), the First District Appellate Court declares: "Since the reasonableness of the restraint is a question of law, we review the trial court's determination 
de novo
."  Here arises the difficulty.  If, as the above authorities hold, a trial court's determination of enforceability entails the resolution of disputed factual matters as well as legal issues, then 
de novo
 review cannot be the only standard applied.  "In Illinois, a judge's or jury's findings of fact in a civil case are generally accorded manifest-weight review," but "[a] judge's rulings of law in a civil or criminal case are reviewed under the nondeferential 
de novo
 standard."  
Franz v. Calaco Development Corp.
, 352 Ill. App. 3d 1129, 1139 (2004).  In our assessment, the enforceability of a restrictive covenant is best viewed as presenting separate questions of law and fact, in the same way as a ruling on a motion to suppress is currently viewed in Illinois.  A ruling on a motion to suppress is reviewed as follows:

"First, we uphold the trial court's findings of historical fact unless such findings are against the manifest weight of the evidence.  [Citation.]  The trial court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony.  [Citation.]  However, this court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted.  [Citation.]  Accordingly, we review 
de novo
 the ultimate question of whether the evidence should be suppressed.  [Citation.]"  
People v. Conner
, 358 Ill. App. 3d 945, 948-49 (2005).

Where there are no disputed facts, the review is entirely 
de novo
.  
People v. Miles
, 343 Ill. App. 3d 1026, 1030 (2003).  Courts in other jurisdictions have taken this two-tiered approach to restrictive covenants.  See, 
e.g.
, 
Turner v. Caplan
, 268 Va. 122, 125, 596 S.E.2d 525, 527 (Va. 2004); 
Mutual Service Casualty Insurance Co. v. Brass
, 242 Wis. 2d 733, 737, 625 N.W.2d 648, 651 (Wis. App. 2001).  We hold that, where the existence of a legitimate business interest turns on an issue of disputed fact, such issue is reviewed under the manifest-weight standard, but the question of whether a covenant is enforceable under the facts is a legal question subject to 
de novo
 review.  Of course, where the issue on review is whether a preliminary injunction should issue to enforce a restrictive covenant whose validity is in question, the reviewing court may find itself applying three different standards.  The manifest-weight and 
de novo
 standards will apply to the question of enforceability, and whether a covenant is enforceable or not will become a factor in the ultimate analysis of whether a preliminary injunction should issue, such analysis being reviewable for abuse of discretion.

Plaintiff's first argument on appeal is that the trial court committed reversible error by resolving the ultimate merits of the issue of enforceability.  "The purpose of a preliminary injunction is not to determine controverted rights or to decide controverted facts of the merits of the case."  
Schweickart v. Powers
, 245 Ill. App. 3d 281, 290 (1993).  The trial court, in its written order denying the petition for a preliminary injunction, framed the issue as "whether the non-competition agreement signed by Grove at the time of her hire is enforceable," and ultimately determined that the covenant "is not enforceable."  Plaintiff points to the decisive and unqualified tone of the language.  Nonetheless, we cannot conclude that the trial court actually reached the ultimate merits of the dispute, for the court set the matter for further proceedings.  In any event, we reverse the trial court for other reasons explained below and need not resolve this issue.

We agree with plaintiff that the trial court erred on the issue of whether plaintiff showed a reasonable likelihood of proving the confidential nature of the client information retained by Grove after she left plaintiff's employ.  "[W]hile an employee, at the termination of his employment, can take with him general skills and knowledge acquired during the course of his employment, he may not take confidential particularized information disclosed to him during the time the employer-employee relationship existed which are unknown to others in the industry and which give the employer advantage over his competitors."  
Burt Dickens & Co. v. Bodi
, 144 Ill. App. 3d 875, 879 (1986).  "Customer information cannot be protected if it is generally available to employees, known by persons in the trade, or easily found in telephone directories and industry directories."  
Appelbaum
, 355 Ill. App. 3d at 934.

The trial court's reasoning was based on an erroneous understanding of the evidence.  The trial court was exclusively concerned with the mere identities of the clients, noting that this information was accessible through business directories.  The client profiles, however, contained not only client identities but client business cycles, expiration dates, and personnel preferences--information that indisputably is not available in directories.  As the evidence showed, business cycles determine staffing needs, and knowledge of a prospective client's business cycles will aid a staffing agency in serving that client's needs.  There is a similar value to staffing agencies in knowing the personnel preferences of plaintiff's clients, worker placement history, and expiration dates of contracts between plaintiff and its clients.  In 
Burt Dickens
, cited by plaintiff, the court held that knowledge of the expiration dates of plaintiff's insurance contracts would be valuable for competitors, for it would enable them to contact plaintiff's clients when their contracts were up for renewal.  The expiration dates, the court held, were confidential because they generally were unknown to others in the industry and could provide competitors an advantage.  
Burt Dickens
, 144 Ill. App. 3d at 881-82.  We must say the same of the contract expiration dates, business cycles, worker placement history, and personnel preferences compiled by plaintiff in this case.

Our conclusion is further supported by 
Tower Oil & Technology Co. v. Buckley
, 99 Ill. App. 3d 637 (1981).  There, the court held that the defendant, a salesman for an industrial lubricant company, acquired confidential information through meetings with his fellow salesmen in which they "exchanged ideas concerning the servicing of their customers" and "discussed new products and the proper application thereof."  
Tower Oil
, 99 Ill. App. 3d at 643.  The court explained that "[p]rior knowledge of the needs of a prospect, the type of products which would satisfy these needs, and the proper application of these products would certainly assist a salesman in persuading the prospect to change its supplier."  
Tower Oil
, 99 Ill. App. 3d at 643-44.  Similarly, the client information that Grove acquired would be a substantial asset in an attempt to deprive plaintiff of staffing opportunities.  Also, the knowledge of plaintiff's markups and the reasons therefor would be of equal value to a competitor.  See 
Lyle R. Jager Agency, Inc. v. Steward
, 253 Ill. App. 3d 631, 640 (1993) (worksheets for determining insurance premiums were confidential because they would give a competitor the " 'inside scoop' as to what a customer's current insurance rate is and how it was calculated").

Significant also is the data about the personal characteristics of the contact people.  Plaintiff's witnesses repeatedly emphasized that plaintiff retained this information to fulfill its overarching aim of establishing personal relationships with its clients.  The witnesses explained that the personal relationship with the client fortifies the business relationship and leads to a commendatory referral.  Gault testified that the "little things," such as gifts and parties, increase goodwill.  Thodos testified that plaintiff is unique in its efforts to introduce a personal element into the business relationship.  This claim was uncontested; Migliore, who operates one of plaintiff's competitors, gave no indication that his firm takes a like approach.  This personal information, we conclude, provides a competitive advantage to plaintiff and therefore is confidential.  See 
Donald McElroy, Inc. v. Delaney
, 72 Ill. App. 3d 285, 291 (1979) ("In a highly competitive business, personal customer contact and the insider knowledge of the customer's requirements are important to the continued success of the business").  In 
McElroy
, the plaintiff was in the business of extracting silver from photographic materials.  The defendant, the plaintiff's former purchasing manager, not only had access to "information about [the plaintiff's] equipment, recovery capabilities, yield figures, bidding procedures and suppliers' requirements," but had "established customer contacts through close personal involvement with [the defendant's] suppliers."  
McElroy
, 72 Ill. App. 3d at 293.  The court held that "[i]n combination, this insider information could potentially give defendant[] an unfair advantage in bidding against [plaintiff] for photographic waste material."  
McElroy
, 72 Ill. App. 3d at 293.  Here, too, the information in the client profiles could give defendents an unfair competitive advantage in placing workers with plaintiff's clients.

Defendants claim that plaintiff's client information was readily available and thus not confidential.  They point to Grove's and Migliore's testimony that the information in the client profiles was obtainable from temporary workers who had worked for the clients as well as from the clients themselves, through phone calls or appointments.  Defendants also note that plaintiff kept client information in file cabinets that were unlocked during the day and did not require its clients to agree to keep information in client proposals confidential.  Plaintiff's witnesses, we note, strenuously disputed Grove's and Migliore's claims.  Gault, for one, testified that plaintiff's sales representatives might try for weeks before obtaining a first appointment.

Arguments similar to defendants' were rejected in 
Lyle R. Jager
, 253 Ill. App. 3d 631, cited by plaintiff.  In that case, the defendant argued that the information he took from the plaintiff, consisting of customer files that included client contact information as well as explanations for how the plaintiff determined insurance premiums, "was not confidential because the information *** could be obtained from the customers themselves, and *** the names and telephone numbers could be memorized."  
Lyle R. Jager
, 253 Ill. App. 3d at 640.  The defendant also noted that the information was kept in unlocked file cabinets and thus was accessible to anyone in the plaintiff's office.  The court nonetheless found the information confidential, stressing that "when individual pieces of information are compiled and organized at a single location as in this case, it is much more valuable and useful than each piece of information individually."  
Lyle R. Jager
, 253 Ill. App. 3d at 640.  The court further noted that "[i]nformation in such a compiled form is not easily obtained or accessible to the public, and information such as the worksheets on which the client's premium rates are calculated [is] not available to the clients."  
Lyle R. Jager
, 253 Ill. App. 3d at 640.  The court also observed that it would be impractical to expect a business to work with locked file cabinets.  
Lyle R. Jager
, 253 Ill. App. 3d at 640.

This reasoning applies here as well.  Plaintiff has taken measures to guard its client information from the public eye.  Plaintiff has made the computerized client profiles accessible by password known only by employees and has given branch managers alone the ability to make printouts of the client files.  Plaintiff has also limited Internet and e-mail availability to branch managers in order to reduce the likelihood of electronic distribution of the client information.  Plaintiff keeps physical files containing client information in a file cabinet in Gault's office, and although the cabinet is unlocked, Gault's permission is required to access it, in contrast to the free access permitted in 
Lyle R. Jager
.  But whatever the ease with which the public may acquire the information in plaintiff's client profiles through simple contact with plaintiff, the workers it has placed, or its clients, the preeminent advantage of the profiles, like that of the customer files in 
Lyle R. Jager
, is that they gather the information in one place.  Presumably, this is the advantage Grove sought for herself by retaining the Client List after she left plaintiff's employ.

For the foregoing reasons, we reject as erroneous the trial court's factual finding that the information in plaintiff's client profiles and in the Client List that Grove possesses is not confidential information.  This erroneous finding was the basis for the court's (prematurely definitive) legal conclusion that the Covenant is not enforceable.  Although the trial court did not expressly say so, it necessarily must have found that plaintiff did not show a reasonable likelihood of succeeding on the merits.  We hold that plaintiff indeed has shown such a likelihood based on the apparent enforceability of the Covenant's confidentiality provision.  We remand this case to the trial court for it to reconsider the appropriateness of a preliminary injunction in light of our holding.  We recognize that the evidence is unclear whether Grove has shared any information from the client profiles or the Client List with anyone at Accurate, a consideration that pertains to the urgency of plaintiff's plea for an injunction.  On remand the trial court will have to consider such factors in its analysis.  Our holding today is limited to the enforceability of the confidentiality provisions of the Covenant.

Finally, we note that the trial court did not appear to address plaintiff's claims under the Trade Secrets Act.  We direct the trial court to consider on remand whether a preliminary injunction should issue under the Trade Secrets Act.

For the reasons stated above, the judgment of the circuit court of McHenry County is reversed and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

GROMETER and BYRNE, JJ., concur.