No. 2-10-0073     Filed:  10-4-10

---

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

---

| | |
|---|---|
| STEAM SALES CORPORATION, | ) Appeal from the Circuit Court |
| | ) of Kendall County. |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) No. 09--CH--793 |
| | ) |
| BRIAN SUMMERS, | ) |
| | ) |
| Defendant-Appellant | ) Honorable |
| | ) Timothy J. McCann, |
| (John Kelly, Defendant). | ) Judge, Presiding. |

---

JUSTICE BOWMAN delivered the opinion of the court:

In this interlocutory appeal, we consider the enforceability of a restrictive covenant in an employment agreement between plaintiff, Steam Sales Corporation, and defendant Brian Summers.[1] After Summers ceased working at Steam Sales, Steam Sales sought a preliminary injunction based on Summers' alleged violation of the restrictive covenant.  The Kendall County circuit court granted the preliminary injunction, and Summers appeals.  We affirm.

I. BACKGROUND

On August 4, 2009, Steam Sales filed against Summers a complaint for injunctive relief, which alleged as follows.  Steam Sales had been engaged in the business of providing boiler room

---

[1]At the hearing for the preliminary injunction, Steam Sales advised the court that it wished to withdraw its allegations against John Kelly and proceed against only Summers.

equipment to industrial and commercial companies since 1958. On March 20, 2007, on Summers' request, Steam Sales and Summers entered into a written employment agreement. Summers' duties at Steam Sales included soliciting and servicing customer accounts. Steam Sales was an exclusive manufacturer's representative for numerous companies, including Johnston Boiler, Fulton Boiler, Selkirk, and Madden Manufacturing. Being an exclusive manufacturer's representative meant that all of the manufacturer's parts had to be purchased through Steam Sales, which allowed Steam Sales to repair and maintain existing equipment, provide quotes for new equipment, and renew and extend service contracts. Because Steam Sales had access to these manufacturers' pricing information--information that was not available to other companies that made similar products--Steam Sales had a competitive edge over its competitors.

Steam Sales had been the exclusive manufacturer's representative for Johnston Boiler for many years, entering into annual agreements by which Steam Sales sold over $1 million per year of Johnston Boiler equipment. Although Summers was given the responsibility of negotiating and renewing Steam Sales' annual agreement with Johnston Boiler, Johnston Boiler did not renew the agreement after it expired on December 31, 2008. After Summers terminated his employment at Steam Sales on January 23, 2009, he started a competing company, BEC Equipment. On July 27, 2009, Johnston Boiler president Kim Black advised Steam Sales that it intended to enter into an exclusive agreement with BEC Equipment. In addition, Steam Sales had been a distributor for Industrial Steam since the 1970s. After Summers left Steam Sales, Industrial Steam provided Summers with an office and advised Steam Sales that it would no longer allow Steam Sales to sell any of its products; Summers would be the new exclusive manufacturer's representative.

Steam Sales alleged that through BEC Equipment, Summers had been "actively soliciting, offering to provide, providing, selling or offering to sell services and products identical or similar to those" Steam Sales offered to the customers to which it had sold in the two-year period prior to Summers' departure (January 23, 2007, to January 23, 2009). These companies included Transloading Specialties, International Paper, Prairie Packaging, Dart Container, Oswego School District, Hemmingway Incorporated, NuFarm Americas, and Trane Incorporated. Steam Sales alleged that Summers had violated the employment agreement, which contained a restrictive covenant that is now the subject of this appeal:

> "a. <u>Restrictive Covenant</u> For a period of two (2) years following the termination of Summers' employment with Steam Sales, Summers shall not solicit, offer to provide, provide, sell or offer to sell any service or product identical to or similar to those which Steam Sales sells to any customer to whom Summers or Steam Sales has made sales during the immediately preceding two (2) year period prior to the date the employment relationship ends.
>
> b. <u>Enforceability</u> The parties agree that in the event of a breach of paragraph 6.a., it would be difficult, if not impossible, to ascertain damages that might result to Steam Sales. Accordingly, Steam Sales shall be entitled, in addition to any remedies it might have under this Agreement or law, to injunctive and other equitable relief to prevent or mitigate any threatened or actual breach of paragraph 6.a."

The agreement was signed and dated by the parties on March 20, 2007.

According to Steam Sales' complaint, Summers' actions had harmed the reputation, good will, and business relationships that Steam Sales enjoyed with its customers, and Summers'

continued actions would cause Steam Sales irreparable harm. Steam Sales asked the court to: (1) enjoin Summers from soliciting or providing products or services to any customer Steam Sales had sold to from January 23, 2007, to January 23, 2009; (2) enjoin Summers from using or possessing Steam Sales' confidential and proprietary services contracts, parts list files, client user lists, proposal files, price books, or other information relating to customers; and (3) order Summers to return all such information to Steam Sales. Steam Sales also requested that the court enter a temporary restraining order (TRO) to this effect.

On August 11, 2009, Summers filed an answer to Steam Sales' complaint and a memorandum to deny the motion for a TRO. Summers, who had over 30 years' experience in the industry, disputed that he had asked to sign the employment agreement. He also disputed that he owned BEC Equipment; he was only an employee there. Summers further alleged that: on January 1, 2008, he was given a new position in a new company started by the owners of Steam Sales, called Steam Sales Service Corporation, which meant that he was no longer doing the job he was originally hired to do; there was no employment agreement for this new position; he had no choice but to leave after the commission structure was changed; and he never received the $25,000 promised to him for taking the new position. In addition, Summers alleged that the employment agreement was unenforceable due to various breaches by Steam Sales, including a unilateral change to the compensation terms and the failure to provide a promised 401(k) plan. Summers denied taking or having in his possession any confidential information belonging to Steam Sales.

A hearing commenced on August 19, 2009, and we begin by summarizing the testimony of Wayne and John Greenwood. Wayne Greenwood, former president of Steam Sales, sold the company to his son, John Greenwood, in 2003. Steam Sales was a manufacturer's representative of

certain selected principals or vendors, and it would buy and resell equipment for assembling boiler rooms. A vendor was a manufacturing company from which Steam Sales bought equipment, and a customer was a company to which Steam Sales sold equipment or provided service. Although buying and reselling equipment was the primary method of generating revenue, Steam Sales also made money by offering service contracts and parts for the boiler equipment it sold. After making a sale to a particular customer, Steam Sales had a significant advantage over its competitors for follow-up work. Selling a boiler through an exclusive manufacturer's representative agreement gave Steam Sales an advantage over the competition because it could customize the equipment to each individual user's needs. Steam Sales' territory covered half of northern Illinois, four counties in northwest Indiana, a portion of southern Wisconsin, and a small area in Iowa. The boiler business was a competitive industry. Developing new clients was difficult because a boiler was a long-term investment, and long-standing relationships were required to service the equipment or sell new equipment. To gain new business and maintain existing customers, Steam Sales did trade shows, advertising, charity events, and lunch and learn programs, which cost over $100,000 a year.

Summers had worked in the industry for many years. He worked for Steam Sales in 1999 but then left a couple of years later to work for a competitor. Summers then returned to Steam Sales in 2003. As an employee of Steam Sales, Summers had access to files containing customer names, purchase orders, serial numbers, and service contracts. Summers left Steam Sales on January 23, 2009. Some of Steam Sales' customer files were missing after Summers left. The files contained "particulars about a job," such as equipment type and pricing. Steam Sales' contract files from the past two years were also missing. John admitted that he had no evidence that Summers took any files or documents from Steam Sales. Wayne suspected that Summers was in the process of starting

a new business before he left Steam Sales. Wayne testified that during the last few months in 2008, every time Summers received a call on his cell phone, he would "leap" out of his office to go to the back of the warehouse where no one could overhear his conversation. Steam Sales paid for the cell phone and reviewed the phone records, which showed "a great deal" of "cell activity" to and from Dominic Susin, the manager of BEC Equipment and also the national sales manager of Industrial Steam.

Steam Sales had exclusive representative agreements with several manufacturers. Steam Sales had acted as Johnston Boiler's exclusive representative for 18 to 20 years, and it was a principal vendor account, generating between $1 million to $2 million per year. John admitted that after Steam Sales obtained the exclusive representative agreement with Johnston Boiler, there were a few years that Johnston Boiler did not renew the agreement with Steam Sales (2000 to 2002). In 2003, when Summers resumed employment at Steam Sales, Steam Sales again became the exclusive representative for Johnston Boiler. Renewing Steam Sales' annual contract with Johnston Boiler was one of Summers' jobs in 2008. John did not know that Johnston Boiler would not be renewing its contract with Steam Sales that year until after Summers left. BEC Equipment now had the exclusive representative agreement with Johnston Boiler. John conceded that some personnel at Johnston Boiler had a personality conflict with Wayne. Johnston Boiler had also complained about Steam Sales' slow payment of invoices. Losing the Johnston Boiler exclusive representative agreement created several problems for Steam Sales. John testified that he had a number of orders in which an existing customer using Johnston Boiler equipment wished to expand and add another Johnston Boiler boiler. The customers wanted Steam Sales to be able to service both boilers, and it was

difficult to turn away a customer because Steam Sales was no longer able to purchase Johnston Boiler equipment.

Fulton Boiler was another major vendor account. Steams Sales had an exclusive representative agreement with Fulton Boiler for 52 years, and it was a "handshake" agreement. Wayne testified that Summers had made "a couple of calls" to Fulton Boiler. Other companies that Steam Sales had exclusive representative agreements with included Selkirk and Madden Manufacturing. Steams Sales also had an agreement with Industrial Steam that was 99% exclusive. However, Dominic Susin advised Steam Sales that Industrial Steam would no longer do business with Steam Sales, because Summers "now [had] that line." Steam Sales lost two jobs as a result.

John testified that Transloading Specialties had been a customer of Steam Sales for the last 10 to 15 years; International Paper for the last 15 to 20 years; Prairie Packaging for the last 4 to 5 years; Dart Container for "a long time"; Oswego School District for the last 4 to 5 years; Hemmingway for the last 10 to 15 years; NuFarm Americas for the last 4 to 5 years; and Trane Incorporated for the last 2 or 3 years. Steam Sales had made sales to all of these companies during the last two years that Summers was employed there. Summers breached the employment agreement by competing with Steam Sales after he left. Summers either formed a company or worked for a company that solicited and sold products to Steam Sales' customers. Summers breached the employment agreement by contacting Steam Sales' vendors and customers and causing some of them to cancel or not renew their contracts. Wayne identified exhibits 3 and 4 as all of Steam Sales' customer sales in 2007 and 2008.

John testified that Summers wanted to enter into the employment agreement in order to be on "the same program" as another salesman, John Kelly. Steam Sales entered into employment

agreements with Summers and Kelly but with no other employees. "Everybody knew up front what this was for"; Steam Sales needed the agreement for any salesman who had the potential to pack up his bags on short notice and take Steam Sales' customers and vendors with him. The employment agreement applied to vendors and customers, although it did not specifically state "vendors." The employment agreement also did not discuss the territory it covered. John testified that the employment agreement did not restrict Summers from working in the field and that Summers was free to sell boilers to companies that had not been customers or vendors of Steam Sales during the past two years. Summers asked John for "a release" after he quit working for Steam Sales.

John testified that an addendum to the employment agreement provided that a 6% administrative fee would be taken out of the available commission before calculating the individual commissions. For example, if the available commission was $100,000, the 6% would reduce it to $94,000. Even though Summers was supposed to receive a 20% commission of the $94,000, he would receive 30% for some reason. The 6% was not taken directly from Summers' commission, and he never complained about it because he understood that it was an administrative tool used to keep track of multiple jobs. John admitted that Summers never signed the addendum and that there was no financial gain for Summers to do so.

Summers was a salesman for Steam Sales. In January 2008, he moved into a sales manager role. As a sales manager, Summers' responsibilities included training other salespeople; attending sales meetings and trade shows; and promoting sales. Because of his additional duties as a sales manager, Summers could no longer work exclusively as a sales representative. John offered Summers $25,000 at the end of the year for performing as a sales manager. The sales manager agreement was never put into writing, and Summers was never paid the $25,000. John testified that

Summers did not perform well as a sales manager and did not earn the $25,000 bonus. In early 2008, John also offered Summers the position of service manager for Steam Sales Service Corporation. John offered to pay Summers 20% of Steam Sales Service Corporation's profits, although Summers would not be employed by that company. Summers accepted the position, though there was no agreement in writing, and Summers never received any additional income for that position. John explained that the agreement was that Summers would work one full year at Steam Sales Service Corporation in order to get paid and Summers did not stay for the entire year. John admitted that Summers wore three hats for Steam Sales and that the employment agreement only dealt with the sales representative hat. According to John, Summers' duties never changed while the employment agreement was in effect.

Steam Sales never had a 401(k) plan. It had a retirement plan in the form of a profit-sharing individual retirement savings account (IRSA) for the last 20 years. Summers participated in the retirement plan and withdrew his money after he left Steam Sales.

Summers testified next as an adverse witness. Summers denied asking Steam Sales employee Jerry Lemon to come work for him at BEC Equipment. He told Lemon that he left Steam Sales because he was not paid a commission. Summers read the employment agreement before signing it, and he never objected to it or discussed it with John or Wayne. There were two manuals that Summers admitted that he did not return when he left Steam Sales. He did not object to the 6% administration fee because he was being paid 30% commissions, even though the employment agreement provided for 20% commissions. While employed at Steam Sales, including when he originally joined the company in 1999, Summers participated in the profit-sharing plan. When he left Steam Sales, Summers received a $35,000 payout from the profit-sharing plan.

Summers further testified that he was the number one salesman for Johnston Boiler while working at Steam Sales. Summers assumed that Johnston Boiler would automatically renew their one-year contract; he did nothing as sales manager to make sure it got renewed. In August 2009, Summers got the Johnston Boiler account for BEC Equipment. Summers did not set up BEC Equipment and did not even know who owned it. Dominic Susin was the sales manager and chief operating officer of Industrial Steam. Steam Sales had been a distributor for Industrial Steam, which was a vendor/manufacturer, based on a verbal agreement. Now, BEC Equipment was the exclusive representative of Industrial Steam. Summers agreed that exhibits 3 and 4 represented Steam Sales' customer sales in 2007 and 2008. Since leaving Steam Sales, Summers admitted, he had attempted to sell products to Transloading Specialties, International Paper, Dart Container, Oswego School District, Hemmingway Incorporated, NuFarm Americas, and Trane Incorporated. All of these companies had been customers of Steam Sales during the past two years, as reflected in exhibits 3 and 4.

Michael Chesnutt testified next as follows. Chesnutt began working at Steam Sales in April 2001 and remained there for about eight years. He worked in parts and accounting and as operations manager. When Summers left Steam Sales, his draws exceeded the commissions that he had earned, meaning that he owed money to Steam Sales. Summers was mistakenly paid 30% commissions instead of the 20% provided in the employment agreement. Even with the 6% administrative fee, Summers was overpaid in that he received 24% commission. Lemon worked at Steam Sales for three or four months and after he left Steam Sales, he and Chesnutt spoke. When asked if he knew the reason for Lemon's departure, Chesnutt answered that he could only speculate. Steam Sales' counsel attempted to impeach Chesnutt with his deposition testimony on this point, and Summers'

counsel objected. The trial court allowed the deposition testimony for the limited purpose of impeachment, and not for the truth of the matter asserted. During his deposition, Chesnutt stated that Lemon left Steam Sales because he was recruited by Summers.

At this stage, Summers moved for a directed finding on the basis that Steam Sales failed to establish a prima facie case for a preliminary injunction. According to Summers, there was no valid employment agreement in effect when he terminated his employment at Steam Sales, and the restrictive covenant was not reasonable. Steam Sales countered that the "activity restraint" was reasonable geographically in that it applied only to customers that were located in northeastern Illinois, "a little bit of Wisconsin," and northwest Indiana. The trial court denied Summers' motion for a directed finding.

Wayne Greenwood testified as an adverse defense witness. Wayne had no idea who took the missing records from Steam Sales. When asked where in the employment agreement it stated that Summers was not allowed to compete with Steam Sales, Wayne admitted that the agreement did not contain the word "compete."

Chesnutt was recalled as a defense witness. Summers' position as sales manager took a lot of time, and he devoted more time to acting as a sales manager than as a sales representative. Chesnutt believed that both positions were full-time jobs. Summers told Chesnutt that he left because he was unhappy that he never received the $25,000 he had been promised. In addition, Summers was never paid 20% of the profits from Steam Sales Service Corporation. Chesnutt left Steam Sales in April 2009, about three months after Summers. Summers had a very good reputation in the industry, and it was common for a manufacturer/vendor to follow a sales representative after

he left a company if that sales representative was the primary driver of sales for that manufacturer.

The trial court issued a written order on January 5, 2010. The court found that Steam Sales was entitled to a preliminary injunction because: it had clearly ascertained rights in need of protection, embodied by "the listing of customers and the established client relationships which [Steam Sales] deals with in the course of its trade"; there was no adequate remedy at law to protect its interests; and irreparable harm would be incurred in the absence of an injunction. Regarding the likelihood of success on the merits of the case, the court made the following findings of fact. It was irrelevant which party initiated or requested the employment agreement. Summers was hired as a sales representative, and the employment agreement provided that Summers was to diligently work exclusively to further the interests of Steam Sales in that role. The employment agreement further provided that Steam Sales maintained a 401(k) plan in which Summers would participate. Although Steam Sales never had a 401(k) plan, it did have an IRSA plan, in which Summers had participated. The court noted that "both sides incorrectly assumed the IRSA plan was in fact a 401(k) plan." Summers withdrew his funds from the IRSA plan when he left Steam Sales, and the evidence did not show that he complained about the lack of a 401(k) plan while employed at Steam Sales. This bolstered the concept that both parties mistakenly assumed that the retirement plan in effect was a 401(k) plan, and Summers' argument that Steam Sales breached the employment agreement on this basis lacked merit. Similarly, Summers' argument that Steam Sales breached the employment agreement by imposing the 6% administrative fee also failed. According to the court, the "evidence clearly established that Summers was mistakenly overpaid throughout his employment at Steam Sales despite the imposition of that fee." Next, Summers could not prevail on the claim that Steam

Sales breached the employment agreement by changing his position from salesman to sales manager. "Despite accepting the position of sales manager, Summers continued to work as a salesman for Steam Sales, thus the provisions of the [employment] Agreement still applied."

Because Steam Sales did not materially breach the employment agreement, it was valid and Steam Sales was entitled to injunctive relief. Specifically, Steam Sales was entitled to a TRO and a preliminary injunction enjoining Summers from "soliciting, offering to provide, providing, selling or offering to sell any service or product identical to or similar to those which Steam Sales sells to any customer to whom Summers or Steam Sales made sales from January 23, 2007 to January 23, 2009." With respect to the other relief sought by Steam Sales, namely, ordering Summers to return its confidential and proprietary files, the court found that when Summers left Steam Sales, he left those documents behind. "No evidence was received which indicated that Summers is or was in possession of any of [Steam Sales'] confidential and proprietary service contracts, parts list files, client user lists, proposal files, or price books/information relating to customers after he left the employment at Steam Sales."[2]

Summers timely appealed.

## II. ANALYSIS

On appeal, Summers argues that the restrictive covenant is unenforceable for essentially two reasons: first, Steam Sales' material breaches of the employment agreement relieve him of his obligation under the restrictive covenant; and second, the restriction is unreasonable.

_____

[2]Because the trial court did not find that Summers had removed Steam Sales' customer files, we omitted from our recitation of the facts testimony relating to this issue.

To be entitled to a preliminary injunction, a plaintiff is required to show that a "fair question" exists regarding his claimed right and that the court should preserve the status quo until the case can be decided on the merits. Lifetec, Inc. v. Edwards, 377 Ill. App. 3d 260, 268 (2007). A party seeking a preliminary injunction is required to demonstrate (1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case. Mohanty v. St. John Heart Clinic, S.C., 225 Ill. 2d 52, 62 (2006). A preliminary injunction requires a showing by a preponderance of the evidence. Lifetec, Inc., 377 Ill. App. 3d at 268. Generally, we review a decision granting or denying a preliminary injunction for an abuse of discretion. Mohanty, 225 Ill. 2d at 62-63. "However, whether injunctive relief should issue to enforce a restrictive covenant not to compete in an employment contract depends upon the validity of the covenant, the determination of which is a question of law" entitled to de novo review. Mohanty, 225 Ill. 2d at 63.

As stated, Summers' first contention is that the employment agreement is not valid due to Steam Sales' material breaches of its terms. Summers points to the failure to provide a 401(k) plan; the unilateral modification of his promised commission, by implementating the 6% administrative fee; the added position of sales manager, which materially changed the terms of the employment agreement in that it prevented him from working exclusively as a sales representative; the failure to pay him $25,000 for accepting the position; and the added position of service manager for Steam Sales Service Corporation, which also prevented him from working exclusively as a sales representative. Summers argues that these breaches resulted in Steam Sales' waiver of the terms of the employment agreement, making him an at-will employee with no restrictive covenant.

"Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations." Mohanty, 225 Ill. 2d at 70; see also Virendra S. Bisla, M.D., Ltd. v. Parvaiz, 379 Ill. App. 3d 567, 572 (2008) (a breach of contract can operate to discharge the duties of a covenant not to compete where the breach is material). "Whether a breach is material involves a determination of ' "whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage consider such a breach to be material, and whether the allowance of reciprocal non-performance by the nonbreaching party will result in his accrual of an unreasonable or unfair advantage." ' " Virendra S. Bisla, M.D., Ltd., 379 Ill. App. 3d at 572-73, quoting William Blair & Co. v. FI Liquidation Corp., 358 Ill. App. 3d 324, 346-47 (2005), quoting Sahadi v. Continental Illinois National Bank & Trust Co. of Chicago, 706 F.2d 193, 196 (7th Cir. 1983). The issue of whether a material breach of contract has been committed is a question of fact. Mohanty, 225 Ill. 2d at 72. In this case, the trial court rejected all of Summers' claims that Steam Sales had materially breached the employment agreement. We will not disturb the trial court's determination unless it is against the manifest weight of the evidence. Mohanty, 225 Ill. 2d at 72.

We agree with the trial court that Summers' claims that Steam Sales materially breached the employment agreement lack merit. First, Summers' argument regarding the 401(k) plan is defeated by his participation in and lack of objection to the IRSA profit-sharing plan. While the employment agreement did specify that Steam Sales would provide a 401(k) plan, the trial court found that the parties mistakenly considered the IRSA plan to be a 401(k) plan. The evidence showed that Summers participated in the IRSA plan during both periods of his employment at Steam Sales; that he received a $35,000 payout when he terminated his employment; and that he never objected to the

lack of a 401(k) plan or the utilization of the IRSA plan. Because Summers failed to establish how he was prejudiced, the court's finding on this point is not against the manifest weight of the evidence.

Second, the implementation of the 6% administrative fee to the available commission did not amount to a material breach. Although it is true that Summers never signed the fee addendum, and that it was not in his financial interest to do so, the fact remains that Summers was still receiving more than his bargained-for commission. The employment agreement provided for Summers to receive a 20% commission. Nevertheless, it was undisputed that, for whatever reason, Summers was receiving a 30% commission. Summers fails to show how he was prejudiced by the 6% administrative fee, because he was still receiving 4% more than he was promised. Moreover, Summers conceded as much at trial.

Last, Summers' claims with respect to his additional positions as sales manager and service manager do not somehow demonstrate material breaches of the employment agreement. The testimony at the hearing showed that Summers wore three hats at Steam Sales: sales representative, sales manager, and service manager for Steam Sales Service Corporation. According to Summers, the two added positions prevented him from working exclusively as a sales representative, thereby releasing him from the employment agreement. Summers hinges his argument on the following language in the employment agreement: "During the term of his employment with Steam Sales, Summers will faithfully and diligently work exclusively to further the interests of Steam Sales in his role as Sales Representative in exchange for the revised compensation and benefits set forth in section 2 below." (Emphasis added.) Summers misinterprets the language in the employment agreement by reading it as though it required him to work exclusively as a sales representative.

Contrary to Summers' assertion, "exclusively" pertains to his furtherance of the interests of Steam Sales when working in that role. We agree with the trial court that Summers' continuation in the role of sales representative, regardless of his acceptance of the other two positions, meant that the employment agreement still applied. Likewise, Summers' argument that Steam Sales breached its promises to him with respect to these other positions, by failing to pay him $25,000 and 20% of the profits, does not somehow invalidate the employment agreement. We note that the burden was on Summers to prove a material breach. However, there is no evidence in the record to support his position that his acceptance of the other two positions somehow voided the employment agreement. See Mohanty, 225 Ill. 2d at 75 (because the plaintiffs did not carry their burden of proving a breach of contract by the defendants, the plaintiffs did not show why they should be relieved of their obligations under the restrictive noncompete covenants in their contracts). In sum, Summers has not provided sufficient evidence to establish material breaches or that the employment agreement was not in full force and effect.

Summers' second overall contention is that the restrictive covenant is not enforceable because Steam Sales failed to establish a legitimate business interest and because it is unreasonable in terms of time and territory. The restrictive covenant prevented Summers--for the two years following his termination date (January 23, 2009, to January 23, 2011)--from soliciting or selling any service or product identical or similar to those provided by Steam Sales to any customer to which Steam Sales had actually made a sale during the previous two-year period (January 23, 2007, to January 23, 2009). Thus, for two years after leaving, Summers would be prevented from soliciting or doing business with any of the customers that Steam Sales had sold to during the previous two years.

Summers argues that the trial court, in its written order, did not specifically address the reasonableness of the restrictive covenant, and he is correct. Perhaps this is because much of Summers' attack on the employment agreement focused on Steam Sales' alleged material breaches of its terms. In any event, it is clear that the trial court impliedly found the restrictive covenant reasonable by enjoining Summers from "soliciting, offering to provide, providing, selling or offering to sell any service or product identical to or similar to those which Steam Sales sells to any customer to whom Summers or Steam Sales made sales from January 23, 2007 to January 23, 2009." For the following reasons, we agree that the restrictive covenant is enforceable.

We first address Summers' argument that Steam Sales failed to satisfy the "legitimate-business-interest" test. As recently as 2005, this court articulated the legitimate-business-interest test as follows:

"Courts will not enforce a covenant not to compete unless the terms of the agreement are reasonable and necessary to protect an employer's legitimate business interests. [Citation.] A legitimate business interest exists where: (1) because of the nature of the business, the customers' relationships with the employer are near-permanent and the employee would not have had contact with the customers absent the employee's employment; or (2) the employee gained confidential information through his employment that he attempted to use for his own benefit." The Agency, Inc. v. Grove, 362 Ill. App. 3d 206, 214 (2005).

See also Hanchett Paper Co. v. Melchiorre, 341 Ill. App. 3d 345, 352 (2003) (same); Dam, Snell & Taveirne, Ltd. v. Verchota, 324 Ill. App. 3d 146, 151-52 (2001) (same). As Steam Sales points out, however, the viability of the legitimate-business-interest test was recently called into question in Sunbelt Rentals, Inc. v. Ehlers, 394 Ill. App. 3d 421, 432 (2009). In Sunbelt, the Fourth District

surveyed various Illinois Supreme Court cases dating from 1896 to the present and concluded that the supreme court had never embraced the legitimate-business-interest test. Sunbelt, 394 Ill. App. 3d at 429-32. In even stronger language, the Sunbelt court rejected that test completely, reasoning that "its application is inconsistent with the supreme court's long history of analysis in restrictive covenant cases." Sunbelt, 394 Ill. App. 3d at 431. As opposed to the legitimate-business-interest test, Sunbelt cites the two-prong reasonableness test appearing in Mohanty, the most recent supreme court case addressing restrictive covenants.

In Mohanty, our supreme court articulated a two-prong test to be applied when assessing the reasonableness of a restrictive covenant: " ' "In determining whether a restraint is reasonable it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promisor, and whether the restraint imposed is greater than is necessary to protect the promisee." ' " Mohanty, 225 Ill. 2d at 76, quoting House of Vision, Inc. v. Hiyane, 37 Ill. 2d 32, 37 (1967), quoting Bauer v. Sawyer, 8 Ill. 2d 351, 355 (1956). Our research has revealed that this test is firmly rooted in supreme court case law. Canfield v. Spear, 44 Ill. 2d 49, 52-53 (1969) (restriction did not injure the public or cause hardship to the promisor; it was reasonable in terms of time and space); Cockerill v. Wilson, 51 Ill. 2d 179, 183-84 (1972) ("The question raised in the trial court and in the appellate court as to the limitation was whether the radius and time period were greater than necessary," and "In determining the reasonableness of the restriction, the injurious effect thereof upon the general public must be considered as well as any undue hardship on the promisor").

Application of Mohanty's reasonableness test versus the legitimate-business-interest test can lead to different results. This is because the legitimate-business-interest test is outcome-determinative in cases where the employer is unable to establish either a near-permanent relationship or the attainment of confidential information. Unless one of these two criteria is satisfied, the

employer cannot establish a legitimate business interest, since the test contemplates no other means of showing a protectable interest. The legitimate-business-interest test therefore presents a greater hurdle for employers to overcome than the reasonableness test. In other words, a restraint that is reasonable in terms of time and territory will still not be enforceable if the employer is unable to establish a legitimate business interest (i.e., a near-permanent relationship or confidentiality). Doing away with the legitimate-business-interest test would not relieve an employer of demonstrating a protectable interest; it would simply allow for a more contextual approach dependent on the particular facts and circumstances of the case. Therefore, to the extent that Sunbelt can be interpreted to require analysis of only the time and territory aspects of a restraint (see Sunbelt, 394 Ill. App. 3d at 431 ("courts at any level, when presented with the issue of whether a restrictive covenant should be enforced, should evaluate only the time-and-territory restrictions contained therein")), we note that the reasonableness of time and territory should still be evaluated in relation to a protectable interest. But because of the "gatekeeper" function of the legitimate-business-interest test, which precludes consideration of time and territory absent a near-permanent relationship or confidentiality, Sunbelt's rejection of that test does merit some consideration. We decline to resolve that issue now, however, because application of the legitimate-business-interest test is not outcome-determinative in this case. As we explain, the facts demonstrate that Steam Sales enjoyed a near-permanent relationship with its customers, thereby creating a legitimate business interest.

"To determine whether an employer has a near-permanent relationship with its customers, [we] consider the following factors: '(1) the length of time required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of

its clients; (6) the duration of the customer's association with the employer; and (7) the continuity of the employer-customer relationships.' " Hanchett Paper Co., 341 Ill. App. 3d at 352, quoting Audio Properties, Inc. v. Kovach, 275 Ill. App. 3d 145, 148-49 (1995). All of these factors favor Steam Sales.

Wayne and John Greenwood testified that the boiler industry was competitive and unique in the respect that boilers were a long-term investment. Indeed, Steam Sales had been in business since 1958, and Summers had worked in the industry for over 30 years. Because boilers were a long-term investment, it was difficult to develop new clients (factor 3), and long-standing relationships were required to service the equipment and sell new equipment (factor 1). Steam Sales would spend approximately $100,000 annually in efforts to retain customers and attract new ones (factor 2). Many of Steam Sales' customers had worked with Steam Sales for either 4 to 5 years or 10 to 15 years (factors 6 and 7). Relationships with vendors and manufacturers were also long term and involved exclusive representation agreements. Exclusive representative agreements gave Steam Sales a competitive edge because they allowed it to customize equipment to the customer's needs (factor 5). The evidence showed that Steam Sales had had exclusive representative agreements with Johnston Boiler for 18 to 20 years and Fulton Boiler for 52 years. Johnston Boiler was a big account, generating $1 million to $2 million per year, and Summers was the number one salesman for Johnston Boiler while working at Steam Sales (factor 4). Chesnutt testified that it was common for a manufacturer or vendor to follow a sales representative if he or she left a company, which is exactly what happened here. Assuming that the legitimate-business-interest test applies in this case, Steam Sales has satisfied its burden of establishing a near-permanent relationship with its customers and thus a legitimate business interest.

Next, Summers challenges the reasonableness of the time and territory restraints. The restrictive covenant is unreasonable, according to Summers, because it is overbroad, devoid of a geographic restriction, and excessive in terms of the two-year restriction. In Mohanty, our supreme court noted that it had a long history of upholding covenants not to compete in employment contracts involving the performance of professional services when the limitations as to time and territory are not unreasonable. Mohanty, 225 Ill. 2d at 76. As previously mentioned, Mohanty states that in determining whether a restraint is reasonable, a court must consider whether enforcement will be injurious to the public or cause undue hardship to the promisor, and whether the restraint imposed is greater than is necessary to protect the promisee. Sunbelt, 394 Ill. App. 3d at 432.

Summers' claim that the restriction is unenforceable because it lacks a geographic limitation is not persuasive. Covenants containing no geographic limitation have been upheld as reasonable where the purpose of the restriction was to protect the employer from losing customers to a former employee who, by virtue of his employment, gained special knowledge and familiarity with the customers' requirements. Eichmann v. National Hospital & Health Care Services, Inc., 308 Ill. App. 3d 337, 344 (1999). The geographic limitation in this case is the locations of Steam Sales' customers over the past two years, a territory encompassing half of northern Illinois, four counties in northwest Indiana, a portion of southern Wisconsin, and a small area in Iowa. Given the amount of time it takes to develop customers in the boiler industry, and the long-term nature of Steam Sales' customer relationships, we do not find this restriction overbroad or unreasonable. Contrary to Summers' assertion, he is not prevented from working in the industry and no undue hardship will result, because he is free to solicit and service customers who have not worked with Steam Sales in the past two years. In this respect, Summers' reliance on Eichmann is unpersuasive, because in Eichmann, the covenant not only prohibited the plaintiff from competing with the defendant's present customers,

but also prohibited the plaintiff from competing with the defendant's future customers. See Eichmann, 308 Ill. App. 3d at 346.

Similarly, the two-year restraint is not unreasonable. In a case addressing a similar but more restrictive covenant, Arpac Corp. v. Murray, 226 Ill. App. 3d 65 (1992), the court found a five-year restriction reasonable. In Arpac, the plaintiff employer manufactured shrink-wrap packaging machinery. Arpac, 226 Ill. App. 3d at 67. The employment agreement signed by the defendant employee contained a restrictive covenant that prevented the employee for two years from soliciting any of the employer's customers of the previous five years. Arpac, 226 Ill. App. 3d at 67. The trial court found the restrictive covenant enforceable, and the reviewing court affirmed. Arpac, 226 Ill. App. 3d at 75-76. The reviewing court reasoned as follows:

"Here, that portion of the restrictive covenant preventing [the employee] from soliciting Arpac's customers of the previous five years is clearly an 'activity' covenant, designed not to restrict competition, but rather to protect Arpac's relationship with its customers. Such covenants do not require geographic limitations, but must be reasonably related to the employer's interest in protecting customer relationships that its employees developed while working for the employer. [Citation.] In the instant case, the covenant restricts nonsolicitation to only those customers which have had business dealings with Arpac in the previous five years. Because of the nature of the industry and the time involved in the manufacture and marketing of the machinery, the five-year span is not unreasonable; on the average, Arpac's larger customers have had a five-year relationship with the manufacturer. Further, as noted earlier, such a nonsolicitation covenant is reasonable in order to protect Arpac's interest in its customers." Arpac, 226 Ill. App. 3d at 76.

Again, Summers' reliance on <u>Eichmann</u> to challenge the two-year restraint is unpersuasive because in that case, the covenant did not contain a specific time limitation. <u>Eichmann</u>, 308 Ill. App. 3d at 346.

Finally, there is no support in the record for Summers' contention that the restrictive covenant was not ancillary to a valid contract or was subordinate to the contract's primary purpose. While John Greenwood testified that Steam Sales needed the agreement to protect itself from a salesman leaving on short notice and taking customers with him, he also testified that Summers requested the agreement in order to be on the "same program" as another top salesman, Kelly. The employment agreement was comprehensive and contained compensation terms, benefits, etc. The evidence further showed that Summers had worked for Steam Sales in the past, had left, and had then returned. Regardless of which party initiated the agreement, Summers had the option of either not signing it or asking Steam Sales to modify the terms of the restrictive covenant. See <u>Sunbelt</u>, 394 Ill. App. 3d at 433 (the employee had two options if he thought the restrictive covenants in his employment contract would cause him undue hardship: he could have opted not to sign or he could have asked his employer to eliminate or modify the terms of the restrictive covenants). As in <u>Sunbelt</u>, Summers risked the enforcement of the restrictive covenant after he chose to sign it.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Kendall County is affirmed.

Affirmed.

McLAREN and JORGENSEN, JJ., concur.