2023 IL App (1st) 220533
June 23, 2023
Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| TOTAL STAFFING SOLUTIONS, INC., an Illinois Corporation, and QUALIFIED FOOD STAFFING SERVICES, INC., an Illinois Corporation, | ) ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiffs-Appellants, | ) ) | No. 2018 CH 04399 |
| v. | ) ) | The Honorable |
| STAFFING, INC., d/b/a Staff Illinois; MARY THERESE BRAZIER; THOMAS KELLY; and JOSE SIMENTAL, | ) ) ) | Patrick J. Sherlock, Judge, Presiding. |
| Defendants-Appellees. | ) ) ) | |

_____

JUSTICE C.A. WALKER delivered the judgment of the court, with opinion.
Justices Oden Johnson and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiffs Total Staffing Solutions, Inc. ("Total Staffing"), and Qualified Food Staffing

Services, Inc., filed a complaint for preliminary and permanent injunctive relief and damages

against defendants Staffing, Inc., d/b/a Staff Illinois, Mary Therese Brazier, Thomas Kelly, and

Jose Simental. The complaint alleged, *inter alia*, that defendants (1) violated the Illinois Trade

Secrets Act (765 ILCS 1065/2 (West 2018)), (2) violated the Consumer Fraud and Deceptive

Business Practices Act (815 ILCS 505/2 (West 2018)), and (3) tortiously interfered with a prospective economic advantage. After a bench trial, the circuit court entered judgment in favor of defendants and against Total Staffing. On appeal, Total Staffing argues that (1) the circuit court's judgment on count I claim of a Trade Secrets Act violation should be reversed, (2) the circuit court abused its discretion in admitting Marty Lally's hearsay testimony at trial, and (3) the circuit court's judgment on count III claim of a Consumer Fraud and Deceptive Business Practices Act violation and count IV claim of tortious interference with a prospective economic advantage should be reversed. We affirm the circuit court's judgment because the court's conclusions were not against the manifest weight of the evidence, where the evidence supported a finding that defendants did not (1) violate the Illinois Trade Secrets Act, (2) violate the Consumer Fraud and Deceptive Business Practices Act, or (3) tortiously interfere with a prospective economic advantage. We further hold the circuit court did not abuse its discretion in admitting testimony that was not offered for the truth of the matter asserted.

¶ 2                                    I. BACKGROUND

¶ 3      In 1997, Vincent Gallelli, John Falvey, and Craig Kelly formed Total Staffing. Total Staffing is a staffing agency that provides temporary workers to companies in the Chicagoland area. As of 2018, Total Staffing had six branch offices located in Illinois. Defendants are former employees of Total Staffing. Craig, who served as the President of Total Staffing, hired his mother, Mary Therese Brazier, in 1997. Mary resigned from her position on February 18, 2018. Total Staffing employed Craig's younger brother, Thomas Kelly, from 2000 to 2014. Thomas returned to Total Staffing in 2016 and later resigned on February 16, 2018. Total Staffing hired Jose Simental in 1999, and he resigned on July 20, 2016. Craig passed away on January 7, 2018. On

February 19, 2018, Thomas and Mary incorporated Staff Illinois, a staffing agency that provides temporary staffing services within the Chicagoland area. After a meeting with Thomas and Mary, Jose agreed to join Staff Illinois on February 24, 2018.

¶ 4     On April 4, 2018, Total Staffing filed a seven-count complaint for preliminary and permanent injunctive relief and damages against Staff Illinois, Mary, Thomas, and Jose. On April 15, 2019, Total Staffing filed a first amended complaint raising two additional counts. Defendants filed a motion to dismiss counts I through IV and VI through IX. On July 6, 2020, the court granted defendants' motion to dismiss as to counts II, VI, VII, VIII, and IX. On August 24, 2020, Total Staffing filed a second amended complaint. Relevant here, under count I of the complaint, Total Staffing alleged defendants violated the Illinois Trade Secrets Act (765 ILCS 1065/2 (West 2018)). Under count III, Total Staffing alleged defendants violated the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 2018)). Under count IV, Total Staffing alleged that defendants tortiously interfered with a prospective economic advantage when they made misrepresentations to Marty Lally, an officer of Hometown Bagel, and converted the employment of Total Staffing's employees working at Hometown Bagel to Staff Illinois.

¶ 5     The complaint alleged "the lifeblood of [Total Staffing]" relies on the knowledge of the identities and characteristics of its customers. This knowledge included

> "the businesses the customers are in, the number of temporary employee placements they have historically required, the amount they have to spend, the skill sets and types of workers they need, idiosyncratic preferences of their managements from a servicing standpoint, the seasonal cycles of their businesses, and their locations in proximity to pools of workers who can fill their needs."

Total Staffing also relies on the identities and characteristics of its temporary workers. This includes knowledge of "workers who have been trained in the skill sets particular customers need, in the quantities those customers need them, and living within close proximity to those customers, especially workers who fit that description and have a long-standing history working at the particular customer site." Total Staffing stores its customer information on two computer databases, called Ultra 32 and Act!, and stores temporary employee information on the Ultra 32 database. These databases are on a secured server at Total Staffing's Naperville office.

¶ 6    Total Staffing claimed defendants were aware of the information in the Ultra 32 and Act! and used the information to identify and solicit business from seven Total Staffing customers, including Hometown Bagel, Accurate Partitions, Midland Metal Products, Bevolution, Golden Country, Scientific Solutions, and Royal Envelope. Total Staffing also asserted defendants used the information to "find an immediately accessible workforce, how much to pay it, and how much to charge the customer" to maintain a competitive advantage.

¶ 7    The case proceeded to a bench trial. Deandra Huerta testified she began working as the office manager at Total Staffing in 2003 and was later promoted to business manager. Thomas, Mary, and Jose also worked at Total Staffing. According to Deandra, Mary was a sales manager and "dealt with clients, she worked with the branches and the manager at the branch to make sure that the clients were being taken care of and their needs were being met." Thomas "oversaw the safety workers' compensation, unemployment at the organization." Thomas left Total Staffing in 2014 but returned in 2016. When he returned, Thomas continued to "manag[e] our work comp claims." Deandra explained "we would all kind of go to [Thomas] for issues or concerns or things that we needed that he had access to in our database that Craig Kelly had, so that if he wasn't there,

we would go to him and ask questions or things that we needed." Jose was the branch manager of the Chicago office. The branch managers "saw the day to day operations of their branches. They handled the job orders, the client needs, the client communication, they went on client visits, making sure that the job orders got filled, making sure that, you know, everything was getting done at the branch."

¶ 8    Deandra testified that customers regularly using temporary workers were critical to the Total Staffing's survival, and these types of customers were difficult to find. To acquire new customers, Total Staffing "did a lot of different things," like receive leads from its employment coordinators and talk with temporary associations to get potential customer names. The process of identifying customers took time because "you didn't know who the contact or the decision maker was right off the bat, you had to sometimes call and call and call until you got that right person." To determine a potential customer's staffing needs, costs, and rates "requires having a phone conversation or a face to face meeting with clients." Total Staffing also collected information about its temporary employees, including "their full name, address, social, phone numbers, skill set, drug screens, [and] background checks." This type of information is not readily obtainable to the public. Deandra stated that "[i]t took us years and years to gather and store that information," and Total Staffing considered this information confidential. The information was stored in the Act! and Ultra 32 databases. An employee needed a username and password to access the databases. Employees had limited access to the databases based on their territory. However, Craig, Mary, and Deandra had full access to the databases. Thomas had full access to Ultra 32, and Jose had access to a portion of Ultra 32. Deandra testified that she was familiar with the seven businesses that left Total Staffing and began receiving staffing services from Staff Illinois. These businesses had worked

with Total Staffing for a "long time" and even some years before their departure. Aside from Midland Metals, none of the businesses made significant complaints about Total Staffing. Deandra explained that, as it pertained to Midland Metals, "there were always some complaints. That was a relatively difficult client." In March 2018, Hometown Bagel contacted Total Staffing, requesting a list of employee names, pay rates, and bill rates. Deandra curated the list, and a Total Staffing employee gave the list to Hometown Bagel.

¶ 9    Joseph Gallelli, son of Total Staffing owner Vincent Gallelli and current president of Total Staffing, testified that Total Staffing searches for prospective clients by using several databases providing different organizations that the agency may want to target for business. Total Staffing then obtains the prospective organization's contact information and "start[s] doing business development" such as phone calls and office visits to the organization. Joseph explained that the process is "certainly a—a grind to get, you know clients." When Joseph was the vice president of Total Staffing, he wanted to join the customer meetings to introduce himself, get to know the customers, and learn about their business and how to service them. He did not join the meetings to "pick on" Mary.

¶ 10    Vincent Gallini, an owner of Total Staffing, testified that he and John Flavey were the original owners at the inception of Total Staffing. Shortly thereafter, Craig became the third owner of Total Staffing and hired Mary to work for the agency. In Total Staffing's early years, Vincent had a conversation with Craig and Mary after he learned they started a similar staffing agency. Craig and Mary admitted they were starting an agency but would stop their efforts. Vincent was concerned and considered whether Craig and Mary would continue to work for Total Staffing. However, Vincent decided to take "[Craig] at his word and [Mary] at her word that things were

going to be better. And all this stuff was going to be behind us, and we were going to go forward." Vincent informed Craig and Mary that they had to sign noncompetition agreements. Vincent allowed Craig to handle the noncompetition agreement because "he was the partner. I took him at his word. I wanted to make sure that he knew I trusted him." Vincent never followed up to ensure Craig and Mary signed noncompetition agreements.

¶ 11    Paul Flavey, son of Total Staffing owner John Flavey, testified that, after Craig's death, he worked at Total Staffing "to kind of sort things out there and just make sure we could still keep the ship running." The day after Craig's death, Deandra informed Paul that she was having lunch with Thomas and Mary. Paul thought the lunch meeting was unusual because he remembered having a conversation with his father years ago that "[Craig] and [Mary] had gone and tried to or were in the process of starting some other type of staffing firm." After learning about the lunch, Total Staffing negotiated and executed a new employment contract with Deandra.

¶ 12    Thomas Kelly, the CEO and president of Staff Illinois, testified that he began working at Total Staffing in 2000 and signed a noncompetition agreement on September 25, 2000. During his employment, Thomas handled workers compensation and unemployment claims. He also did other tasks such as plumbing, electrician, and other handywork at the office. Thomas signed a non-competition agreement on September 25, 2000, but never discussed signing a non-competition agreement when he returned to Total Staffing in 2016. Thomas knew that Total Staffing stored information about its customers and employees in the Ultra 32 and Act! databases. During Thomas's first term of employment between 2000 and 2014, he had unrestricted access to Ultra 32. When Thomas returned to Total Staffing in 2016, he did not have a computer to access Ultra 32 but would use Deandra's computer to access the database to help employees update their

passwords. Thomas never recorded or stored Deandra's login information. Thomas never had access to the Act! database. Thomas never copied, printed, or otherwise took any information from the two databases. On the day of Craig's passing, Thomas took two laptop computers from Craig's house and took them to Mary's house. The next day, Thomas and Mary went to the Naperville branch office and met with Deandra. A few days later, Thomas returned and went through Craig's office. Thomas looked through "two file boxes where they pulled his personal belongings" and took some file documents from the office.

¶ 13    Thomas stated Staff Illinois's first customer was Hometown Bagel. Marty Lally, an officer of Hometown Bagel, and Craig were best friends, and "the Lally family and our family, we have cottages on the same lake in Michigan. We hang out most weekends." Shortly after Thomas left Total Staffing, Thomas informed Marty that Thomas and Mary were starting a staffing agency. Thomas, Mary, and Jose subsequently had a meeting with Marty and his sister, Kathy Lally, on March 21, 2018. During the meeting, Thomas stated that Paul and Joe, the children of Total Staffing owners Vincent and John, "stabbed [Mary] in the back"; Mary felt betrayed because the employees were instructed not to schedule client meetings for her; Thomas and Mary planned to start a competing staffing agency after she quit; and Paul and Joe were treating Craig's children unfairly. After the meeting, Hometown Bagel agreed to work with Staff Illinois. The temporary workers were given an opportunity to become employees of Staff Illinois or stay with their current staffing agency and obtain another assignment. This process occurred because "a temporary employee is an employee of the staffing agency, not the client." Hometown Bagel informed Staff Illinois of the workers' pay rates and determined the bill rate, *i.e.*, the "percentage that [Staff Illinois] charge over the pay rate." Thomas never asked Hometown Bagel to obtain any

information from Total Staffing. Regarding the other six customers, Thomas explained that these customers also provided the bill rate, stating, "It's basically, this is what it is, take it or leave it. And if we want the business, we will meet it. If we don't want the business, we don't." Staff Illinois never based the bill rate on information obtained from Total Staffing.

¶ 14     Thomas testified that Staff Illinois obtains temporary workers by posting "a lot of fliers everywhere we can. Job boards, word-of-mouth referrals. Talk to employees. Hit the streets. Hustle." Staff Illinois obtains customers by contacting temporary employees' previous employers because "most of the time, if they're a temporary worker coming to work for us, they were a temporary worker at their other location." This method is "100 percent our process right now. We have no salespeople." Thomas admitted that he contacted Jose before he resigned from Total Staffing but Thomas's conversation with Jose concerned Craig's passing. Thomas also admitted he informed a senior customer service executive for the Chicago Blackhawks, a nonclient of Total Staffing, that Total Staffing was changing its name to Staffing, Inc. and the agency was moving locations. Thomas explained that Craig personally paid for and owned the Blackhawks tickets.

¶ 15     Terra Kelly Gibbons, Craig's daughter, testified that she went to Craig's house on the day of his passing. She became upset with her uncle, Thomas, because he was "taking a lot of personal calls" and had removed personal belongings like a flash drive, "a leather bag that was filled with a bunch of papers," and two laptop computers. The laptops belonged to Craig and, according to Terra, were taken "to whoever Total Staffing uses for IT." The next day, Thomas changed the locks at Craig's home and informed Terra that "nobody was going to have access to the house except for [Mary]."

¶ 16    Mary Brazier testified that she began working at Total Staffing in 1997. Mary never signed a noncompetition agreement. In her employment role, Mary "contacted businesses and tried to get them to be clients of Total Staffing." Throughout her employment, Mary developed an understanding of various customers' business needs, and Total Staffing encouraged their employees to establish relationships with customers. Mary was familiar with the Ultra 32 and Act! databases. She used Ultra 32 "occasionally" and used Act! to keep track of Total Staffing's customers. Mary was also an administrator of Act! and would give employees passwords to the database. Mary never copied, printed, or otherwise took any information from Ultra 32 or Act! Shortly before Mary resigned from Total Staffing, she received an e-mail from Joseph, stating that Joseph wanted to be informed and included in all client meetings and phone calls. Mary stated that she was "really surprised to hear this because I never had to bring anybody with me before, other than the branch managers" and that she felt "[v]ery angry." When Hometown Bagel joined Staff Illinois, Mary told Jose to inform the temporary employees that Hometown Bagel was switching staffing agencies. Mary testified that she also conducted the same conversion process during her employment with Total Staffing several times.

¶ 17    Leticia Noriega, Total Staffing's branch manager at the Brookfield office, testified that she and Mary met with Reynaldo Salvador, plant manager of Accurate Partitions, on February 8, 2018. Before Reynaldo arrived, Mary complained to Leticia that the new management was "bad people" and "bastards." During the meeting, Mary only discussed Total Staffing business and did not say anything negative about Total Staffing. A week later, Mary came to the Brookfield office "looking at papers we have in the front, which were applications and some policies." Leticia thought Mary's

actions were "weird because she never got it—she never got involved with those papers." Mary did not make copies of or take any of the documents when she left.

¶ 18    Jose Simental testified that he began working at Total Staffing in September 1999 and signed a noncompetition agreement on August 21, 2000. The agreement contained an 18-month noncompetition provision, which ended on January 20, 2018, based on Jose's resignation date of July 2016. Jose was familiar with and used the Ultra 32 database and knew the database contained information about Total Staffing's customers and temporary employees. Jose did not take any information with him when he left the agency, and his first contact with Thomas and Mary after he left Total Staffing was on February 10, 2018. He was hired by Staff Illinois on March 21, 2018. During his employment with Staff Illinois, Jose contacted and obtained business from Science Solution, Bevolution, Evans Food, and Royal Envelope. Mary obtained business from Midland Metals and Accurate Partition. These companies were Total Staffing's former customers, and Jose first learned of these companies while working at Total Staffing. After Staff Illinois obtained Hometown Bagel as a customer, Jose had a meeting with the Total Staffing employees who worked at Hometown Bagel. He informed the employees that (1) Hometown Bagel was switching staffing agencies, (2) the workers who wanted to continue working for Hometown Bagel had to complete a Staff Illinois application, and (3) the workers who wanted to stay employed with Total Staffing needed to seek another work assignment.

¶ 19    Esmeralda Chavez, a former temporary employee for Total Staffing, testified that she worked at Hometown Bagel for two or three years. During her second year, Jose told Esmeralda and other Total Staffing employees that he was the owner of Staff Illinois, that Total Staffing "was gonna shut down," and that he wanted the employees to "switch over." Elvira Melendez, another

former temporary employee for Total Staffing, testified that the owner of Hometown Bagel, Kathy Lally, informed workers that Hometown Bagel decided to change staffing agencies and the workers had to decide whether they wanted to work for the new staffing agency or seek work reassignment with Total Staffing. Jose then discussed Staff Illinois with the workers and provided applications. Elvira decided to join Staff Illinois because she wanted to continue working at Hometown Bagel.

¶ 20    Marty Lally, an officer of Hometown Bagel, testified that Total Staffing provided temporary employees to Hometown Bagel. Marty knew Craig as Total Staffing's president and CEO. Marty and Craig were also friends, and Marty knew Thomas. Marty explained Hometown Bagel had issues with Total Staffing's services, such as "orders going unfilled, people not showing up when they said people were gonna show up, and also some unqualified workers where they would show up and they were not fit for the job, and then we'd—you know, just kind of a turnstile at the door." When Hometown Bagel came across a problem, Sam, Hometown Bagel's production manager, would handle the issue, and Marty would receive information about any problems from Sam. Despite the issues, Hometown Bagel never changed staffing agencies "because of Craig." Hometown Bagel switched to Staff Illinois because "Craig was no longer." Hometown Bagel did not inform Total Staffing that it was switching to Staff Illinois because "[w]e weren't happy with the services to begin with, and like everything else, we do change suppliers from time to time." Marty testified that Hometown Bagel set the pay rate for the temporary employees. Hometown Bagel provided a list of its temporary employees' pay rates and bill rates to Staff Illinois in March 2018.

¶ 21    Reynaldo Salvador testified that he worked at Accurate Partitions from 2011 to 2019. Reynaldo first met Mary when he worked for a company called Marietta Corporation. At the time, Mary worked with Total Staffing and had helped Reynaldo "out of a couple of different difficult situations." During Reynaldo's employment with Accurate Partitions, Total Staffing was Accurate Partitions' sole provider of temporary labor. Toward the end of their business relationship, Accurate Partitions "had recurring service issues with Total Staffing." Reynaldo called Mary because he knew Mary "would talk to the Total Staffing team. She would give them a nudge, I guess so to speak, so that they could get me the people that I needed." Mary informed Reynaldo that she was working for another staffing agency, and Reynaldo asked if Mary's agency could help Accurate Partitions. Reynaldo stated that Mary never said anything negative about Total Staffing. Accurate Partitions maintained its relationship with Total Staffing and used multiple staffing companies after it obtained temporary workers from Staff Illinois. Reynaldo explained, "I have always believed in the world that I live in in [*sic*] manufacturing, you never put your eggs just in one basket. So, I made sure that I kept the relationship with Total as well as with Illinois."

¶ 22    At the conclusion of the trial, the circuit court entered judgment in favor of defendants and against Total Staffing on all remaining counts. Regarding count I, the court held defendants did not violate the Illinois Trade Secrets Act because (1) Total Staffing's list of customers was known to others outside of the agency including temporary employees, (2) there was no evidence that defendants accessed the Ultra 32 and Act! Databases, and (3) "while plaintiff claims that it is difficult to find users of temporary labor, defendants testified to the contrary." Regarding count III, the court held defendants did not violate the Illinois Consumer Fraud and Deceptive Business Practices Act where there was no evidence that defendants misrepresented any information to

Hometown Bagel; defendants informed Total Staffing employees working at Hometown that Staff Illinois was not associated with Total Staffing; and Total Staffing did not change its name. Defendants also required Total Staffing employees to submit employment applications to join Staff Illinois. Regarding count IV, the court held defendants did not tortiously interfere with Total Staffing's business relationship with Hometown Bagel but, instead, engaged in lawful competition. The court found, "Hometown was not happy with the quality of service provided by Total Staffing (according to Marty Lally) and Hometown also had a close familial reason to switch from Total Staffing to Staff Illinois." This appeal follows.

¶ 23                                    II. JURISDICTION

¶ 24    On August 24, 2020, Total Staffing filed a second amended complaint for preliminary and permanent injunctive relief and damages. The circuit court entered its judgment on March 18, 2022. Total Staffing filed a notice of appeal on Monday, April 18, 2022.[1] We have jurisdiction over this appeal, pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 303 (eff. July 1, 2017).

¶ 25                                    III. ANALYSIS

¶ 26    On appeal, Total Staffing argues that (1) the circuit court's judgment on count I claim of a Trade Secrets Act violation should be reversed, (2) the circuit court abused its discretion in admitting Marty Lally's hearsay testimony at trial, and (3) the circuit court's judgment on count III claim of a Consumer Fraud and Deceptive Business Practices Act violation and count IV claim

---

[1] Because plaintiffs' notice of appeal was due on April 17, 2022, which fell on a Sunday, the notice of appeal filed on Monday, April 18, 2022, was timely. See Ill. S. Ct. R. 303(a) (eff. July 1, 2017) (notice of appeal must be filed within 30 days after final judgment); 5 ILCS 70/1.11 (West 2022) (providing how to compute time within which to file notice of appeal when the final day is a Saturday, Sunday, or holiday); *In re Estate of Malloy*, 96 Ill. App. 3d 1020, 1025 (1981) (notice of appeal filed 32 days after final judgment was timely, as preceding days were Sunday and a holiday).

of tortious interference with prospective economic advantage should be reversed. We review each issue respectively.

¶ 27                                    A. Illinois Trade Secrets Act

¶ 28    The Illinois Trade Secrets Act allows recovery of damages for the misappropriation of trade secrets. 765 ILCS 1065/4 (West 2018); *Multimedia Sales & Marketing, Inc. v. Marzullo*, 2020 IL App (1st) 191790, ¶ 17. " 'To set forth a cause of action for violation of the Act, a plaintiff must allege facts that the information at issue was: (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business.' " *Multimedia Sales & Marketing, Inc.*, 2020 IL App (1st) 191790, ¶ 17 (quoting *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1068 (2000)).

¶ 29    Total Staffing argues that we should reverse the trial court's judgment on the trade secret claim for three reasons. First, the circuit court misapplied the Trade Secrets Act when it held that a trade secret requires a person to sign a confidentiality agreement or agree to absolute secrecy to constitute "sufficiently secret" information under the Trade Secrets Act. Second, the circuit court erred in holding that misappropriation under the Trade Secrets Act requires a physical downloading or copying of the trade secret information. Third, the circuit court's finding that it was "not difficult to find users of temporary labor" was against the manifest weight of the evidence.

¶ 30    Defendants assert the circuit court's finding that defendants did not violate the Trade Secrets Act was not against the manifest weight of the evidence. Specifically, defendants claim Total Staffing's customer and employee information was not a trade secret because (1) the information was easily obtainable from temporary employees and customers and (2) there was no evidence that defendants accessed Total Staffing's databases that contained the customer and

- 15 -

employee information. Furthermore, defendants allege there was no evidence that they misappropriated the customer and employee information. Lastly, defendants argue the circuit court's finding that it was "not difficult to find users of temporary labor" was a proper credibility determination.

¶ 31    Generally, the standard of review after a bench trial is whether the order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. A decision is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). When the issue is whether the circuit court applied the correct legal test to the evidence presented, then the issue is a question of law, which is reviewed *de novo*. *Reliable Fire Equipment*, 2011 IL 111871, ¶ 13.

¶ 32    Preliminarily, we address the parties' dispute regarding the standard of review for Total Staffing's first two arguments. Total Staffing argues that the court misapplied the law to the undisputed facts and we should review the issues *de novo*. Defendants argue such issues are reviewed under the manifest weight of the evidence standard because the circuit court applied the proper test to weigh the trial evidence. We disagree with Total Staffing's contention that these issues are reviewed *de novo*. In its brief, Total Staffing argues that the trial court misapplied the provisions of the Trade Secrets Act because the law neither requires a person to sign a confidentiality agreement or agree to absolute secrecy for the information to be "sufficiently secret," nor requires a physical downloading or copying of the information to constitute a trade secret. In doing so, Total Staffing does not challenge the circuit court's application of the proper legal test, as it agrees that the Trade Secrets Act is applicable here. Rather, Total Staffing asserts

that the court misapplied the provision of the Trade Secrets Act to the relevant facts in this case. Thus, the questions presented here are factual in nature, and the appropriate standard of review for these issues is the manifest weight of the evidence standard. See *Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶ 39.

¶ 33                                  1. Trade Secret

¶ 34    A "trade secret" is

"information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2 (West 2018).

A "trade secret" must be

"defined in terms of the facts of a particular case, with the following factors to be considered: (1) the extent to which the information is known outside of the employer's business; (2) the extent to which information is known by employees and others involved in the business; (3) the extent of the measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and his competitors; (5) the effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or

duplicated by others." *Smith Oil Corp. v. Viking Chemical Co.*, 127 Ill. App. 3d 423, 427 (1984).

¶ 35    Whether the information constitutes a trade secret focuses fundamentally on its secrecy. *Multimedia Sales & Marketing, Inc.*, 2020 IL App (1st) 191790, ¶ 17. Thus, to show that information falls within the Trade Secrets Act's purview, the plaintiff must show that the information was sufficiently secret to give plaintiff a competitive advantage and plaintiff took affirmative measures to prevent others from acquiring or using the information. *Id.* Under the Trade Secrets Act, information is not sufficiently secret to qualify for protection when it is "within the realm of general skills and knowledge" in the relevant industry. (Internal quotation marks omitted.) *REXA, Inc. v. Chester*, 42 F.4th 652, 664 (7th Cir. 2022).

¶ 36    The Second District's decision in *Smith Oil Corp.*, 127 Ill. App. 3d at 427, provides guidance on this issue. There, the court reviewed whether an employer's customer information was protected as a trade secret. *Id.* In finding that the information in its case was not a trade secret, the court stated:

    "The manifest weight of the evidence adduced at the hearing supports the conclusion that the customer sales reports were not trade secrets. There was evidence that the defendants did not need the plaintiffs' sales report because the customer would give the salesman the price he was paying previously in order to get a competitive price; that product and pricing information was routinely given out by Smith order clerks to customers over the phone; that the customer lists were not under lock and key and were available to any clerk or employee; that computer sales reports were not restricted as to access nor locked up; that the defendants knew who the major customers in the industry were from

general experience and merely had to ask the customer to give him a copy of the blanket orders, price structure and names of the products he was buying in order to compete; and that customers commonly dealt with more than one supplier, depending on who made the best bid. While it is undisputed that knowing who the customers are and what their needs are is valuable business information, the trial court's conclusion that the salesman's knowledge comes under the category of general knowledge and not under the category of a protectable trade secret is supported by the manifest weight of the evidence." *Id.* at 428.

¶ 37 Similarly, the evidence here supports a finding that Total Staffing's customer and employee information were not "sufficiently secret" to gain a competitive advantage. The evidence shows some of the alleged information, such as pay and bill rates, was determined by and obtained from the customers. The information was also easily obtainable from Total Staffing. When requested, Total Staffing gave Hometown Bagel a list of employee names, pay rate, and bill rate information. Hometown subsequently gave the information to defendants. Thomas testified he never asked Hometown Bagel to obtain the information from Total Staffing. Although access to the Ultra 32 and Act! databases were restricted, based on an employee's position and branch territory, defendants testified that any information used to obtain the seven former Total Staffing costumers did not come from these databases. Rather, defendants knew the customers by developing personal relationships with the decision-makers and gathered information, such as the pay and bill rates, from the customers. Like *Smith Oil*, the evidence supports the conclusion that defendants used their general skill and knowledge, rather than "confidential particularized plans or processes developed by the employer," to obtain its customers. See *id.* at 427 ("Generally, an employee whose employment has terminated may not take 'confidential particularized plans or processes

- 19 -

developed by his employer,' but may take 'general skills and knowledge acquired during his tenure with the former employer' " (quoting *Schulenburg v. Signatrol, Inc.*, 33 Ill. 2d 379, 387 (1965))).

¶ 38    Total Staffing claims that the Second District's decision in *The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206 (2005), is analogous to this case. There, the issue before the court was whether the provisions of a covenant not to compete were enforceable. *Id.* at 209. In reviewing the issue, the court had to determine whether "the employee gained confidential information through his employment that he attempted to use for his own benefit." *Id.* at 214. The court stated an employee "may not take confidential particularized information disclosed to him during the time the employer-employee relationship existed which are unknown to others in the industry and which give the employer advantage over his competitors." (Internal quotation marks omitted.) *Id.* at 216. The court found that the computerized client profiles containing client identities, client business cycles, expiration dates, and personnel preferences gave defendant and her subsequent employer an unfair competitive advantage. *Id.* at 217-18. The court also found that the information was relatively unknown where plaintiff took measures to guard its client information from the public. *Id.* at 219.

¶ 39    The court held, based on these facts, that the information was confidential, and thus, the circuit court erred in finding the covenant was unenforceable. *Id.* The court explained that its holding was "limited to the enforceability of the confidentiality provisions of the Covenant" and remanded the case for the circuit court to consider "whether a preliminary injunction should issue under the Trade Secrets Act." *Id.* at 220.

¶ 40    Here, the issue before us is whether the alleged information constitutes a trade secret under the Trade Secrets Act and involves a different legal framework and procedural posture than those

presented in *Agency*. See *id.* at 216 (considering whether the confidentiality provisions of the covenant were enforceable and "the question of whether a covenant is enforceable under the facts is a legal question subject to *de novo* review"). Therefore, we find *Agency* distinguishable from this case. Here, Total Staffing did not treat the information as confidential and secret because Total Staffing gave Hometown Bagel a list of employee names, pay rate, and bill rate information. Also, some customers conducted business with multiple entities, such that their identities were known. Accordingly, we hold the circuit court's finding that the customer and employee information were not protectable trade secrets was not against the manifest weight of the evidence.

¶ 41                                    2. Misappropriation

¶ 42    Total Staffing argues that the circuit court erred as a matter of law by concluding there was no misappropriation. We find that there can be no misappropriation of a trade secret where there is no trade secret. Because we find that the circuit court's ruling that Total Staffing failed to establish a protectable trade secret was not against the manifest weight of the evidence, the question of whether defendants misappropriated trade secrets is moot.

¶ 43                             3. Factual Finding (Temporary Labor)

¶ 44    In its ruling, the circuit court found "while plaintiff claims that it was difficult to find users of temporary labor, defendants testified to the contrary. The [c]ourt finds that defendants' testimony is more credible than plaintiff's testimony." The trial evidence supports the circuit court's finding, as the evidence infers that customers were available and accessible. Thomas testified that Staff Illinois obtained customers from its temporary employees' employment history. The witnesses testified that it was common for customers to use multiple staffing companies at one time, especially when one staffing company could not provide enough temporary employees

to fulfill labor demands. Reynaldo testified that Accurate Partitions used multiple staffing companies after it obtained business from Staff Illinois and that it maintained a relationship with both Total Staffing and Staff Illinois. The circuit court found this testimony more credible than the testimony of other witnesses, who testified that finding users of temporary labor was difficult. "Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Therefore, we hold that the circuit court's finding regarding temporary labor was not against the manifest weight of the evidence.

¶ 45                                        B. Hearsay Testimony

¶ 46     Total Staffing argues that the circuit court abused its discretion by admitting Marty Lally's hearsay testimony that Sam, Hometown Bagel's production manager, informed Marty that Total Staffing was not performing well. Total Staffing claims Marty's testimony was material to the court's decision on the Consumer Fraud and Deceptive Practices Act claim. Defendants contend Marty's testimony was not hearsay because it was not offered for the truth of the matter asserted but, rather, to elicit the reason why Marty decided to terminate Total Staffing's services. Defendants further claim that the issue is waived because Total Staffing failed to object "until well after [Marty] made his statements." Illinois courts apply an abuse of discretion standard when reviewing a trial court's decision regarding the admission of hearsay. *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 20. An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 47 We first address the defendants' waiver argument. To preserve an issue for appellate review, a party must make a timely objection. *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 467 (2001). Generally, timeliness requires that objections to evidence be made at the time the evidence is offered or as soon as the grounds for the objection become apparent. *Id.* During examination of Marty Lally, the following exchange occurred:

"[DEFENDANTS' ATTORNEY]: Do you recall any issues with Total Staffing services to Hometown Bagel?

A. Yeah, there were issues of not fulfilling orders and (inaudible).

[DEFENDANTS' ATTORNEY]: I can't hear you.

A. There were issues of orders going unfilled, people not showing up when they said people were gonna show up, and also some unqualified workers where they would show up and they were not fit for the job, and then we'd—you know, just kind of a turnstile at the door.

* * *

[DEFENDANTS' ATTORNEY]: Mr. Lally, when there was a problem with an employee of Total Staffing, who dealt with it, you or Sam, the production manager?

A. Mostly Sam.

[DEFENDANTS' ATTORNEY]: So, anything that you knew or think you knew about the problems came from Sam, correct?

A. Correct.

[PLAINTIFFS' ATTORNEY]: Your Honor, I ask his prior testimony about the problems be stricken as hearsay.

[DEFENDANTS' ATTORNEY]: Your Honor, he said most of, he didn't say all of.

THE COURT: The request to strike the testimony is denied."

¶ 48    Here, the grounds for objection became apparent when Marty identified that the information regarding Total Staffing's performance did not come from himself but from Sam, the production manager. At that moment, the plaintiffs' attorney objected to Marty's prior statement. Thus, we find plaintiffs' objection timely, and the issue was preserved for appellate review. As such, we consider whether the circuit court improperly allowed Marty's alleged hearsay statement.

¶ 49    Hearsay is a statement, other than a statement made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *McIntyre v. Balagani*, 2019 IL App (3d) 140543, ¶ 92. An out-of-court statement offered as evidence for some purpose other than to prove the truth of the matter asserted is not hearsay. *McIntyre*, 2019 IL App (3d) 140543, ¶ 92.

¶ 50    Here, Marty's statement about Total Staffing's performance was not offered to prove the truth of the matter asserted—namely, that Sam stated there were issues with unfulfilled orders. Rather, the statements were offered to show what occurred before Hometown Bagel transferred its business to Staff Illinois. Marty's statement does not constitute hearsay and, therefore, was admissible at trial. Accordingly, we find the circuit court did not abuse its discretion in admitting Marty's statement about Total Staffing's performance.

¶ 51              C. Consumer Fraud and Deceptive Business Practices Act

¶ 52    Total Staffing claims defendants engaged in deceptive acts and practices in violation of the Consumer Fraud and Deceptive Business Practices Act when they made misrepresentations to Marty Lally, an officer of Hometown Bagel, about Total Staffing's treatment of Craig's children and mother and converted the employment of Total Staffing's employees working at Hometown

Bagel to Staff Illinois. Defendants assert the circuit court's finding that Hometown Bagel did not rely on any alleged fraud or deception when it transferred to Staff Illinois was consistent with the manifest weight of the evidence.

¶ 53    To state a cause of action under the Consumer Fraud and Deceptive Business Practices Act, a plaintiff must allege (1) a deceptive act or practice was committed by the defendant, (2) the defendants intended that the plaintiff rely on the deception, and (3) the deception occurred during conduct involving trade and commerce. *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.*, 186 Ill. 2d 472, 492 (1999). The Consumer Fraud and Deceptive Business Practices Act defines "unfair or deceptive acts or practices" to include

> "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.' " 815 ILCS 505/2 (West 2018).

¶ 54    Here, Total Staffing claims defendants misrepresented information to Hometown Bagel. "Where the deception is based on a misrepresentation, that misrepresentation must be material and must relate to a matter upon which the plaintiff could be expected to rely in determining whether to engage in the conduct in question." *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 857 (1995). A representation known to be false or made in culpable ignorance of its truth or falsity is fraudulent. *Crowder v. Bob Oberling Enterprises, Inc.*, 148 Ill. App. 3d 313, 316 (1986). Even a negligent or innocent misrepresentation may be actionable under the Consumer Fraud and Deceptive Business Practices Act. *Aliano v. Ferriss*, 2013 IL App (1st) 120242, ¶ 12. As a general

rule, the expression of an opinion does not support an action under the Consumer Fraud and Deceptive Business Practices Act. *In re Estate of Albergo*, 275 Ill. App. 3d 439, 451 (1995). "A representation is one of opinion rather than fact if it only expresses the speaker's belief, without certainty, as to the existence of a fact." (Internal quotation marks omitted.) *Antonacci v. Seyfarth Shaw, LLP*, 2015 IL App (1st) 142372, ¶ 35.

¶ 55 The evidence supports a finding that the statements Thomas made to Marty did not constitute misrepresentations. On March 21, 2018, during the meeting with Marty and Kathy Lally, Thomas told Marty that Paul and Joe "stabbed [Mary] in the back" and that Mary felt betrayed because the Total Staffing employees were instructed not to schedule client meetings for Mary and Thomas. Thomas also stated that Mary planned to start a competing staffing agency after she quit. Mary confirmed in her testimony that she was "[v]ery angry" by the decision that she could not attend client meetings alone. These statements are further supported by Joseph's testimony that he created a new policy that he had to attend all customer meetings when he became vice president of Total Staffing and that he did not "pick on" Mary when he made that decision. Thus, the statements Thomas made to Marty about Mary were not misrepresentations, but truthful statements supported by testimony. Also, during the 2018 meeting, Thomas told Marty that Paul and Joe were treating Craig's children unfairly. Thomas explained he felt this way because Total Staffing

> "just were not giving them, I guess, a seat at the table for my brother's shares. They were giving them a run around. And I didn't feel that it was fair, you know, that this company that basically has a state, they were doing whatever they were doing. I don't know."

Given the context of his statement, the belief of Thomas that Craig's children were treated unfairly speaks to his opinion rather than a misrepresentation.

¶ 56 Furthermore, the evidence also supports a finding that defendants did not misrepresent any information regarding Total Staffing when Staff Illinois converted the temporary employees who worked at Hometown Bagel from Total Staffing to Staff Illinois. Mary testified that, when Hometown Bagel joined Staff Illinois, she told Jose to inform the temporary employees that Hometown Bagel was switching staffing agencies. Mary testified that she also conducted the same conversion process during her employment with Total Staffing several times. Jose testified he informed the employees that Hometown Bagel was switching staffing agencies and that the workers who wanted to continue working for Hometown Bagel had to complete a Staff Illinois application. He also told the employees that the workers who wanted to stay employed with Total Staffing needed to seek another work assignment. Elvira testified that the owner of Hometown Bagel, Kathy Lally, informed workers that Hometown Bagel decided to change staffing agencies and that the workers had to decide whether they wanted to work for the new staffing agency or seek work reassignment with Total Staffing. Jose then discussed Staff Illinois with the workers and provided applications. Although Esmeralda testified that Jose told the temporary employees that Total Staffing "was gonna shut down," her testimony was contradicted by Mary, Jose, and Elvira's testimony, and we will not disturb the trial court's factual findings based on that testimony. See *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). Therefore, we hold the circuit court's conclusion on the Consumer Fraud and Deceptive Business Practices Act claim was not against the manifest weight of the evidence.

¶ 57 D. Tortious Interference With a Prospective Economic Advantage

¶ 58 Total Staffing claims defendants tortiously interfered with a prospective economic advantage when they misrepresented to Marty Lally, an officer of Hometown Bagel, that Total

Staffing treated Craig's children and mother unfairly and converted the employment of Total Staffing's employees working at Hometown Bagel to Staff Illinois. Total Staffing acknowledges the exception of lawful competition; however, it claims the exception is inapplicable here, where defendants engaged in unfair means of competing. Defendants contend they used lawful means to obtain Hometown Bagel's business and, therefore, did not tortiously interfere with a prospective economic advantage.

¶ 59    Under a claim of tortious interference with a prospective economic advantage, a plaintiff must prove (1) a reasonable expectation of entering a valid business relationship, (2) the defendant's knowledge of the plaintiff's expectancy, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damages to the plaintiff resulting from such interference. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991). This court recognizes the privilege of lawful competition. See *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615 (1995). "The privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Id.* This court has relied on the guidance of section 768 of the Restatement (Second) of Torts, which sets forth the elements for lawful competition. Section 768 states:

"(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other." Restatement (Second) of Torts § 768 (1979).

¶ 60 The comments in the Restatement (Second) of Torts further explain each element. Specifically, discussing wrongful means, comment *e* provides, "The predatory means discussed in § 767, Comment *c*, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section. On the other hand, the actor may use persuasion and he may exert limited economic pressure." Restatement (Second) of Torts § 768, cmt. e (1979). Dealing with unlawful restraint of trade, comment *f* explains, "One who refuses to deal with another *** to establish or maintain an illegal monopoly is subject to liability to the other. Obviously, he is subject to liability if for the same purpose he intentionally causes third persons not to deal with the other." Restatement (Second) of Torts § 768, cmt. f (1979). Addressing one's interest in competition, comment *g* states, "if his conduct is directed solely to the satisfaction of his spite or ill will and not at all to the advancement of his competitive interests over the person harmed, his interference is held to be improper." Restatement (Second) of Torts § 768, cmt. *g* (1979).

¶ 61 Considering these factors, the evidence supports a finding that defendants engaged in lawful competition. As to subsection (a), Total Staffing and Staff Illinois are engaged in the same business of providing temporary labor to businesses. As to subsection (b), Mary and Jose testified

they reached out to the businesses at issue only to inform them of their new agency, and these businesses transferred their labor to Staff Illinois because they were experiencing issues with Total Staffing's services or had developed a positive relationship with Mary. Marty testified Hometown Bagel was experiencing staffing problems before it transitioned to Staff Illinois. Reynaldo testified that Accurate Partitions "had recurring service issues with Total Staffing." The evidence supports a finding that none of defendants' actions reach the level of wrongful means anticipated by section 768 of the Restatement (Second) of Torts. At most, the evidence demonstrates defendants' actions were acceptable uses of persuasion in their business practices.

¶ 62    As to subsection (c), the witnesses testified that it was common for customers to use multiple staffing companies at one time, especially when one staffing company could not provide enough temporary employees to fulfil labor demands. For instance, Reynaldo testified that Accurate Partitions maintained its relationship with Total Staffing and used multiple staffing companies after it obtained business from Staff Illinois. Reynaldo explained, "I have always believed in the world that I live in in [*sic*] manufacturing, you never put your eggs just in one basket. So, I made sure that I kept the relationship with Total as well as with Illinois." Thus, the evidence supports a finding that defendants' actions allowed for freedom of trade between the staffing agencies. As to subsection (d), the evidence shows that defendants recruited and obtained business by other means outside of the seven businesses at issue. Thomas testified that Staff Illinois obtains customers by referring to temporary employees' previous employer because "most of the time, if they're a temporary worker coming to work for us, they were a temporary worker at their other location." This method is "100 percent our process right now. We have no salespeople." Thomas also stated that Staff Illinois obtains temporary workers by posting "a lot of fliers

everywhere we can: job boards, word-of-month referrals, talk to employees, hit the streets, hustle."

There is no evidence that defendants' only agenda was to seek Hometown Bagel's business out of spite or ill will. Therefore, the circuit court's finding on the tortious interference with a prospective economic advantage claim was not against the manifest weight of the evidence.

¶ 63                                    IV. CONCLUSION

¶ 64    Pursuant to our deferential standard, the circuit court's findings in favor of defendants and against plaintiffs on counts I, III, and IV of the second amended complaint for preliminary and permanent injunctive relief and damages were not against the manifest weight of the evidence. Accordingly, we affirm the circuit court's judgment.

¶ 65    Affirmed.

*Total Staffing Solutions, Inc. v. Staffing, Inc.*, 2023 IL App (1st) 220533

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2018-CH-04399; the Hon. Patrick J. Sherlock, Judge, presiding. |
| **Attorneys for Appellant:** | Alan W. Nicgorski, of Hansen Reynolds LLC, and Gregg Minkow, of Minkow & Bergman, LLC, both of Chicago, for appellants. |
| **Attorneys for Appellee:** | Gregory J. Jordan and Mark R. Zito, of Jordan & Zito LLC, of Chicago, for appellees. |